[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17503

_____

D.C. Docket Nos. 1:16-cv-03288-ELR; 1:16-cv-03218-ELR


1:16-cv-03218-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

6.04 acres, more or less, over parcel(s) of land of
approximately 1.21 acres, more or less,
situated in Land Lot 1049, et al.,

Defendant,

GAIL BRANDON COCHRAN,

Defendant-Appellant.

_____

1:16-cv-2991-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

80 acres more or less, in Land Lot 74
of the Sixteenth (16th) Land District, Third (3rd)
Section of Bartow County, Georgia and
more particularly described herein, et al.,

Defendants,

VARIOUS DEFENDANTS,

Defendants-Appellants.

_____

1:16-cv-03217-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

4.57 acres more or less, over the following
parcel(s) of land: 0.25 acres, more or less,
situated in Land Lot 37 and 3.70 acres, more
or less situated in Land Lot 28 all in the Sixth (6th)
District of the Third (3rd) Section of Gordon County,
Georgia and more particularly described herein, et al.,

Defendants,

 LEGACY PROPERTIES OF NORTHWEST
GEORGIA, LLC,

Defendant-Appellant.

_____

1:16-cv-03258-ELR

2

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

5.73 acres, more or less, over the following parcel(s)
of land: Approximately 102.593 acres, more or less,
being in Land Lots 1075, 1076, 1077, 1084, and 1085
of the 3rd District, 3rd Section of Paulding County,
Georgia and further Less and Except 1 acre, more or
less, situated in Land Lot 1085 of the 3rd District, 3rd
Section of Paulding County, Georgia, and further Less and
Except Tract 1: 1 acre, more or less, and Tract 2: 0.775
acres, more or less, situated in Land Lot 1075 of the
3rd District, 3rd Section of Paulding County, Georgia
and more particularly described herein, et al.,

Defendants,

NANCY H. TIBBITTS,

Defendant-Appellant.

_____

1:16-cv-03236-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

1.90 acres, more or less, over parcel(s)
of land of approximately 10.013 acres,
more or less, situated in Land Lot 69, of
the Fourth (4th) Land District, of
Coweta County, Georgia,
and more particularly described herein, et al.,

3

Defendants,

DONALD J. MORRIS,

Defendant-Appellant.

_____

1:16-cv-03234-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

2.16 acres, more or less, over the
following parcel(s) of land:
Approximately 80 acres, more or less,
being the West half of Land Lot 31, of
the Sixth (6th) Land District and Third
(3rd) Section of Gordon County, Georgia, Less and
Except 3.828 acres, more or less, situated
in Land Lot 31 of the Sixth (6th) Land
District and Third (3rd) Section of
Gordon County and more particularly
described herein; et al.,

Defendants,

MELVIN M. DOBSON,

Defendant-Appellant.

_____

1:16-cv-03220-ELR,

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

A permanent roadway easement across
23.511 acres situated in Land Lots 64
and 81 of the 3rd District and 3rd Section of
Paulding County, Georgia and more
particularly described herein,

Defendant,

JEFF MOON,

Defendant-Appellant.

_____

1:16-cv-03224-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

2.77 acres, more or less, over parcel(s)
of land of approx. 38.7225 acres, more
or less, situated in Land Lot 568 of the
Third (3rd) Land District, Third (3rd)
Section, of Paulding County, Georgia
and more particularly described herein,

CHARLINE CAMBRON,

Defendant-Appellant.

_____

1:16-cv-3245-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

5

Plaintiff-Appellee,

versus

3.48 acres, more or less, over parcel(s)
of land of approximately 40 acres, more
or less, situated in Land Lot 569
and .75 acres, more or less, situated in
Land Lot 512 in the Third (3rd) Land
District, Third (3rd) Section, of Paulding
County, Georgia, and more particularly
described herein, et al.,

Defendants,

JJBK LLLP,

Defendant-Appellant.

_____

1:16-cv-03238-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

.07 acres, more or less, over parcel(s) of
land of 5.292 acres, more or less, and
being situated in Land Lots 70 and 71
of the Fourth Land District of Coweta
County, Georgia, and being identified
as Tract 2 in that certain Revised Final Plat
of Survey for The Hills At Wager's Mill,
as revised on October 1, 2002 and
recorded on January 22, 2003 in Book 77,
Page 199; in the Plat Records in the
Office of the Clerk of the Superior Court
of Coweta Co, et al.,

6

Defendants,

IAN S. GOLDENBERG,

Defendant-Appellant.

_____

1:16-cv-03223-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

3.30 acres, more or less, over parcel(s)
of land of approximately 39 acres, more
or less, in Land Lots 1035 and 1036
of the Seventeenth (17th) Land District,
and Third (3rd) Section of Bartow
County, Georgia and more particularly
described herein, et al.,

Defendants,

LACKEY GROUP LLC,

Defendant-Appellant.

_____

1:16-cv-3247-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

3.48 acres, more or less, over the
following parcel(s) of land: Approx.

40.00 acres, more or less and lying and being in all of land Lot 726, of the 3rd District, 3rd Section, Paulding County, Georgia, Less and Except 2 acres, more or less, situated in Land Lots 725 and 726 of the 3rd District, 3rd Section of Paulding County, Georgia and more particularly described herein,

Defendant,

PAUL CORLEY,

Defendant-Appellant.

_____

1:16-cv-03230-ELR,

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC.,

Plaintiff-Appellee,

versus

2.17 acres, more or less, over the following parcel(s) of land: Approximately 41.39 acres, more or less, and being in Land Lots 714 and 715 of the 3rd District, 3rd Section, Paulding County, Georgia, Less and Except 3.936 acres, more or less, in Land Lot 715 of the 3rd District, 3rd Section Paulding County, Georgia, Further Less and Except 0.750 acres, more or less, in Land Lot 715 of the 3rd District, 3rd Section, Paulding County, Georgia,

Defendant,

8

PAUL FRANKLIN CORLEY, as executor of the
estate of Hazel Genette Sligh Corley,

Defendant-Appellants.

_____

1:16-cv-3257-ELR

TRANSCONTINENTAL GAS PIPELINE COMPANY, LLC,

Plaintiff-Appellee,

versus

3.94 acres, more or less, over parcel(s)
of land of approximately 102.906 acres,
more or less, situated in Land Lots 68,
77, 78 and 140 of the 3rd District, 3rd
Section, Paulding County, Georgia
and more particularly described herein,

Defendant,

MOON INVESTMENTS, LLC,

Defendant-Appellant.

_____

1:16-cv-03295-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC.,

Plaintiff-Appellee,

versus

12.993 acres, more or less, situated in
Land Lot 59 of the Fourth Land
District of Coweta County, Georgia, et al.,

Defendant,

THOMAS W. SMRCINA,
JEANNIE F. SMRCINA,

Defendants-Appellants.

_____

1:16-cv-03232-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

1.45 acres, more or less, over the
following parcel(s) of land:
Approximately 41.035 acres, more or
less, situated in Land Lot 28 of the 6th
District and 3rd Section of Gordon
County Georgia, Less and Except 4.6497 acres,
more or less, situated in Land Lot 28 of
the 6th District of Gordon County,
Georgia, and more particularly
described within, et al.,

Defendant,

MICHAEL W. HILL,

Defendant-Appellant.

_____

1:16-cv-3250-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

10

versus

.83 acres, more or less, over parcel(s) of
land of approximately 5.003 acres,
more or less and being situated in Land
Lot 71 of the Fourth Land District of Coweta
County, Georgia and more particularly
described herein, et al.,

Defendants,

CHRISTINE MARIE CALI,
f.k.a. Christine M. Snellgrove,

Defendant-Appellant.

_____

1:16-cv-3297-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

50 acres, more or less, situated in Land
Lots 55 and 68 of the Fourth (4th)
Land District of Coweta County,
Georgia; 100 acres, more or less,
situated in Land Lot 68 of the Fourth
(4th) Land District of Coweta County,
Georgia,

Defendant,

GENE A. TERRELL,
JOYCE BAILEY TERRELL,

Defendants-Appellants.

_____

11

1:16-cv-3290-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

10.1824 acres, more or less, situated in
Land Lots 669 and 700 of the 17th
Land District and 3rd Section, of
Bartow County, Georgia

Defendants,

TIM DENSON,
TERA DENSON,

Defendants-Appellants.

_____

1:16-cv-03296-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

16.14 acres and 5 additional acres,
more or less, situated in Land Lot 982
of the Seventeenth (17) District, Third
(3rd) Section of Bartow County,
Georgia - 35.10 acres more or less in Land Lots 962
and 963 of the Seventeenth (17th) District
Third (3rd) Section of Bartow County, Georgia,
et al.,

Defendants,

WILLIAM G. TAFF,
REBECCA K. TAFF,

Defendants-Appellants.

_____

1:16-cv-03293-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

6.59 acres being Tract 7 in Land Lot
669 of the Seventeenth (17th) Land, Third
(3rd) Section of Bartow County, Georgia,
et al.,

Defendants,

HENRY D. MEZ,
RHONDA S. MEZ,

Defendants-Appellants.

_____

1:16-cv-03364-ELR

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

Plaintiff-Appellee,

versus

3.22 acres, more or less, over parcel(s)
of land of approximately 137.56 acres,
more or less, situated in Land Lot 58 of
the Fourth (4th) Land District of

13

Coweta County, Georgia
and more particularly described herein,

Defendant,

HANDY LAND AND TIMBER L.P.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(December 6, 2018)

Before JILL PRYOR and JULIE CARNES, Circuit Judges, and CONWAY,[*]
District Judge.

JULIE CARNES, Circuit Judge:

Transcontinental Gas Pipe Line Company, LLC ("Transcontinental")
brought these consolidated condemnation proceedings against several property
owners in Northwest Georgia (collectively, "Defendants") in order to obtain an
easement for the construction of a natural-gas pipeline.  The district court granted
summary judgment in favor of Transcontinental on the issue of whether it had a
right to condemn certain portions of Defendants' properties under Section 7(h) of
the Natural Gas Act, 15 U.S.C. § 717f(h).  The district court also issued a

---

[*]  Honorable Anne C. Conway, United States District Judge for the Middle District of Florida,
sitting by designation.

14

preliminary injunction allowing Transcontinental to immediately enter Defendants'

properties and begin construction.  As a condition of such access, the district court

required Transcontinental to post a surety bond in an amount equal to twice the

appraised value of Defendants' properties.  Defendants challenge each of those

rulings on appeal.  After careful review, and with the benefit of oral argument, we

affirm.

## BACKGROUND

### I.    Factual Background

Transcontinental is a natural-gas company that transports natural gas back

and forth between the Gulf Coast and the New York City metropolitan area via

pipeline.[1]  Along the route, Transcontinental provides natural gas to customers

throughout the East Coast.

On March 19, 2015, Transcontinental applied to the Federal Energy

Regulatory Commission ("FERC") for a certificate of public convenience and

necessity authorizing it to construct a new natural-gas pipeline in Northwest

Georgia, as well as related facilities in Georgia, North Carolina, and Virginia.  The

new 115-mile lateral pipeline would run from a compressor station on

Transcontinental's mainline in Coweta County, Georgia, to meter stations in

---

[1]  For purposes of the Natural Gas Act, a "natural-gas company" is "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."  15 U.S.C. § 717a(6).

Murray County, near the city of Dalton.  The purpose of the project was to enable

Transcontinental to transport natural gas extracted from the Marcellus shale and

other supply basins in the northeastern United States to customers in the Southeast

and Gulf Coast.  Transcontinental would receive the gas at a point on its mainline

in Mercer County, New Jersey, and deliver it to an interconnection with another

company's pipeline in Mississippi.  Along the way, Transcontinental would

provide natural gas to its customers, including, through the new lateral pipeline,

communities in Northwest Georgia.  This project, which included both the new

lateral pipeline and the related facilities on Transcontinental's mainline, was called

the Dalton Expansion Project.

### A.      Pre-application Preparations for the Dalton Expansion Project

Prior to its March 2015 application, Transcontinental held an "open season"

in May and June of 2012, through which it solicited bids for the natural-gas

transportation services it planned to provide if the Dalton Expansion Project were

ultimately approved by FERC.[2]  As a result of those solicitations, Transcontinental

executed binding precedent agreements with Atlanta Gas Light Company and

Oglethorpe Power Corporation for all of the natural-gas capacity associated with

the Dalton Expansion Project.  A precedent agreement is "a long-term contract

---

[2] An "open season" is comparable to an auction of the pipeline's natural-gas transportation capacity.  *See Process Gas Consumers Grp. v. FERC*, 292 F.3d 831, 833–34 (D.C. Cir. 2002); *N. Nat. Gas Co.*, 110 FERC ¶ 61,361, at 62,426–27 (Mar. 25, 2005).

subscribing to expanded natural gas capacity." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1310 (D.C. Cir. 2015).

As early as April of 2013, Transcontinental began contacting landowners in the general area where it planned to place the pipeline, and requested those owners' permission to access their properties for the purpose of surveying the land. These surveys were obviously necessary to help Transcontinental and FERC decide on the most appropriate route for the pipeline.

In the spring of 2014, through written communications, personal contacts, and by other means, Transcontinental began notifying those landowners who were likely to be affected by construction of the pipeline. In addition, from June through September of 2014, as part of FERC's pre-filing environmental review of the proposed project, FERC staff participated in open houses sponsored by Transcontinental in several cities along the pipeline's proposed route.

In October 2014, FERC published a notice in the Federal Register announcing that FERC environmental staff would conduct "scoping" meetings in three Georgia cities in November 2014, where members of the public could voice any concerns about the environmental impact of the project.[3] Notice of Intent to

---

[3] We take judicial notice of documents published in the Federal Register. *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . ."); *see also Longo v. Seminole Indian Casino-Immokalee*, 813 F.3d 1348, 1349 n.2 (11th Cir. 2016). According to the October 2014 Notice of Intent, FERC is required to "take into account the environmental impacts that could result from an action whenever it considers the issuance of a Certificate of Public Convenience and Necessity," and to "discover and address concerns the public may have about

Prepare an Environmental Assessment for the Planned Dalton Expansion Project, 79 Fed. Reg. 64,186 (Oct. 28, 2014). This notice was also mailed to landowners affected by the proposed pipeline. *Id.* at 64,187–88. Shortly after those scoping meetings, FERC published a second notice in the Federal Register, which, like the first notice, was also mailed to landowners affected by the project. Supplemental Notice of Intent to Prepare an Environmental Assessment for the Planned Dalton Expansion Project, 79 Fed. Reg. 69,455 (Nov. 21, 2014). Both notices informed the landowners that, if the project was approved, Transcontinental would have the right of eminent domain and, if an agreement could not be reached to purchase an easement on their properties, Transcontinental could initiate condemnation proceedings. Supplemental Notice of Intent, 79 Fed. Reg. at 69,455; Notice of Intent, 79 Fed. Reg. at 64,187.

The landowners were also informed that they could intervene in Transcontinental's FERC proceedings once Transcontinental filed its application. Supplemental Notice of Intent, 79 Fed. Reg. at 69,457; Notice of Intent, 79 Fed. Reg. at 64,188. In fact, after Transcontinental filed its application in March 2015, several landowners—including some of the appellants here—filed

---

proposals." Notice of Intent to Prepare an Environmental Assessment for the Planned Dalton Expansion Project, 79 Fed. Reg. 64,186, 64,187 (Oct. 28, 2014). "This process is referred to as scoping." *Id.*

18

motions to intervene in Transcontinental's FERC proceedings, which FERC granted.

### B.    Transcontinental's Application

As noted, Transcontinental filed its application for a certificate of public convenience and necessity on March 19, 2015.  As part of its application, Transcontinental was required to submit alignment sheets detailing the pipeline's proposed route.  *See* 18 C.F.R. § 157.14(a)(6).  These alignment sheets consisted of aerial photographs of the relevant properties on which were drawn property boundaries, mile markers, the pipeline's proposed location, the locations of permanent and temporary easements, access roads, the limits of disturbance to the land, and other features.  FERC used the alignment sheets to determine where the pipeline should go to minimize the pipeline's impact on the environment and landowners.

### C.    Transcontinental's Certificate of Public Convenience and Necessity

On August 3, 2016—more than a year after Transcontinental filed its application—FERC issued the requested certificate of public convenience and necessity.  In the certificate, FERC noted that it had received several comments in response to its environmental assessment, some of which proposed alternative routes for the pipeline.  FERC adopted two of those proposals, one of which was submitted by a landowner who intervened in Transcontinental's FERC proceedings

19

and who was later named as a defendant in the instant condemnation proceedings. With respect to the overall impact on landowners, FERC concluded that, by designing the project in such a way as to locate approximately 49% of the proposed pipeline facilities on already-existing rights-of-way, Transcontinental had "designed the project to minimize adverse impacts on landowners and surrounding communities."

The certificate authorized Transcontinental to construct and operate the Dalton Expansion Project as it was described in the certificate "and as more fully described in the application," particularly in the alignment sheets. The certificate further provided that Transcontinental's exercise of eminent domain in any condemnation proceedings "must be consistent with the[] authorized facilities and locations." The certificate explicitly stated that Transcontinental's right of eminent domain did "not authorize it to increase the size of its natural gas facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas."

**D.    Transcontinental's Post-Certificate Attempt to Purchase Easements for the Dalton Expansion Project**

Shortly after FERC issued the certificate, Transcontinental made a final offer to each of the landowners with whom it had not yet reached an agreement to purchase an easement for construction and maintenance of the new pipeline. Specifically, Transcontinental offered to purchase the easements depicted on

20

certain survey plats attached to its offer letters.  The survey plats were maps depicting the geographic location of the proposed easements relative to property lines and other landmarks.  Transcontinental made clear, however, that the survey plats were "preliminary," and that the final location of the easements would "be fixed and determined by the initial pipeline as installed on Grantor's Land with the Permanent Right of Way being measured as 50 feet in width with the pipeline being located therein."  Once the pipeline was installed, payment would be computed based on an agreed-upon formula, and a new "as built" survey plat would be prepared, a copy of which would be enclosed with the check sent to the landowner and would become part of the agreement.  Transcontinental's proposed easement also included the right to transport "gas, oil, petroleum products, or any other liquids, gases, or substances which can be transported through pipelines."

## II.    Procedural History

### A.    Transcontinental's Condemnation Suits

In late August and early September of 2016—after the deadline for its final offers had expired—Transcontinental brought more than 60 separate condemnation proceedings against the remaining landowners and their properties. Transcontinental attached several exhibits to each of its complaints, including: (1) the survey plats that were attached to its final offer to the landowner, along with a legal description of the geographic locations of the relevant easements; (2) a

21

copy of the FERC-issued certificate of public convenience and necessity; and (3) a description of the terms that Transcontinental hoped would govern the easements once granted.[4]  The district court consolidated the cases.

In most cases, on the same day that it filed the condemnation complaint, Transcontinental also filed a motion for a preliminary injunction allowing it to immediately enter a particular Defendant's property to begin construction of the pipeline.  Absent an injunction granting immediate access, Transcontinental would have had to await the conclusion of the condemnation proceedings, when the amount of compensation due to each landowner would be finally determined.  Thus, in order to establish that a preliminary injunction allowing immediate access was warranted, Transcontinental also filed a motion for partial summary judgment on the issue of whether it had a right to condemn the relevant properties.

### B.    Transcontinental's Evidence in Support of Its Motions

Transcontinental produced three declarations in support of its motions.  First, Transcontinental produced a declaration from the pipeline engineer for the Dalton Expansion Project stating that Transcontinental's survey plats were prepared by a Georgia certified land surveyor.  The surveyor had used the same

---

[4]  Unlike its offer letters, which sought an easement to transport any substance transportable through a pipeline, Transcontinental's complaint sought an easement to install a pipeline solely "for the transportation of natural gas."  As noted, the FERC certificate limited the right of eminent domain to an easement for a pipeline that transports only natural gas.

data that was used to generate the alignment sheets previously submitted to FERC. The declaration further stated that "the location and dimensions of the easements" shown on the survey plats "conform[ed] to the Project path and footprint depicted in the Project Alignment Sheets and other drawings . . . that FERC reviewed and approved." Copies of the alignment sheets and survey plats were attached to the declaration. According to the declaration, the alignment sheets were also available to the public free of charge on FERC's website.

Transcontinental's second declaration was from the land representative for the Dalton Expansion Project. According to that declaration, Transcontinental had made at least two offers to purchase an easement from each Defendant before it filed the instant condemnation proceedings. The declaration further stated that Transcontinental had already acquired more than 78% of the easements necessary for the Dalton Expansion Project. A copy of Transcontinental's final offer to each Defendant was attached to the declaration.

Transcontinental's third declaration was from the Dalton Expansion Project's project manager. According to that declaration, Transcontinental had an in-service deadline of May 1, 2017. That date was necessitated, in part, by contracts and commitments it had made with Atlanta Gas Light Company and Oglethorpe Power Corporation to ensure a purchaser for the natural gas. To meet this deadline, the declaration indicated that Transcontinental would need to enter

23

Defendants' properties by October 1, 2016, to perform environmental, civil, and cultural surveys, complete survey stakeouts, and begin construction.

The declaration further stated that Transcontinental would suffer irreparable harm if it were required to await the completion of the condemnation proceedings before having access to Defendants' properties. First, any delay in the in-service deadline would expose Transcontinental to the risk of contractual penalties, daily lost revenues, and irrecoverable costs. Second, any delay that caused Transcontinental to miss its in-service deadline would also expose Transcontinental to a significant risk of damage to its reputation, competitive standing, and business goodwill.

The project manager went on to declare that an economic analysis conducted by Transcontinental indicated that construction costs for the project would generate approximately $450 million in economic activity within the State of Georgia, utilizing approximately 2,170 workers during the construction phase. The project was projected to generate more than $3 million per year in new economic activity once the pipeline was operational. Any delays in construction would likely delay the realization of these public benefits. The project manager further noted that, in comments submitted to FERC, Atlanta Gas Light Company had asserted that the project was "critically important" because it would provide consumers in Northwest Georgia with "much needed access to the rapidly developing supply

24

basins in the northeastern United States." Atlanta Gas Light Company's comment was attached to the declaration, along with a similar comment submitted to FERC by Oglethorpe Power Corporation.

The project manager next asserted that Defendants would suffer no harm if Transcontinental were permitted to immediately enter their properties because, in the end, Defendants would be fully compensated for Transcontinental's acquisition and use of any easement interests at the compensation stage of the litigation. He further asserted that Transcontinental had obtained a real-estate appraisal report prepared by an independent Georgia-certified real-estate appraiser for each property, and that Transcontinental was willing to post a bond or pay a cash deposit equal to twice the estimated value of the easements, or in any other amount that the district court deemed proper.

## C. Defendants' Evidence in Opposition

In response to Transcontinental's motions, Defendants produced an affidavit from a Georgia-licensed real-estate appraiser. The appraiser took issue with the proposed easement terms that Transcontinental had attached to its complaints. He stated that, under those terms, Transcontinental could deviate from the pipeline location depicted in the survey plats. He further stated that the proposed terms would allow Transcontinental to encumber, at least temporarily, each landowner's entire tract of property, rather than only those portions of the property depicted in

25

the survey plats.  In addition, the appraiser also asserted that the proposed terms would effectively allow Transcontinental to extend its temporary easements indefinitely.

Based on those determinations, Defendants' appraiser ultimately concluded that it was "not possible, without making extraordinary assumptions," to value the rights that Transcontinental sought to acquire either in its final offer letters or as proposed in the complaint.  Defendants also produced the first page of an April 2013 letter from Transcontinental indicating that, at that time, Transcontinental had a "targeted in-service date" of August 2016 for the Dalton Expansion Project.

### D.    The District Court's Evidentiary Rulings

The district court scheduled a hearing on Transcontinental's September 2016 motions,[5] which it later continued at Defendants' request.  The hearing was originally scheduled for October 17, 2016.  Defendants sought a continuance for several reasons, but did not specify a date that would be acceptable to them.  They did, however, ask the district court to rule, before the hearing on Transcontinental's motions, on certain venue issues that they had raised in their answers.[6]  They

---

[5]  Although some of Transcontinental's motions were filed in August 2016, the Defendants in those cases were not served until September.

[6]  Defendants also raised these issues by motion.  Consistent with Defendants' request, the district court ultimately ruled on these issues before the hearing on Transcontinental's motions was held.  It denied Defendants' motions on the grounds that they were procedurally improper under Rule 71.1(e) of the Federal Rules of Civil Procedure, and rejected the arguments raised in Defendants' answers on the merits.  Those rulings are not at issue on appeal.

26

contended that the hearing scheduled for October 17, 2016, would "be an appropriate time to take evidence" on those issues. They further noted that the hearing was scheduled before some of their responses to Transcontinental's motions were due.

Defendants also complained that Transcontinental had not provided them with a witness list, and they sought the opportunity to conduct "expedited written and deposition discovery" before the hearing on Transcontinental's motions. They did not describe what evidence they hoped to obtain through such discovery, but instead made the conclusory assertion that discovery was necessary as a matter of due process. They further contended that discovery would "narrow the issues" that would ultimately have to be explored at the hearing. Defendants also sought the opportunity to present testimony at the hearing, and asked the district court to "set parameters" regarding the exchange of witness lists. However, they neither identified any witnesses nor described any testimony that they expected to present if given the opportunity to do so.

On October 12, 2016, the district court granted Defendants' motion for a continuance, cancelled the October 17, 2016, hearing, and rescheduled that hearing for October 26, 2016. However, the district court denied Defendants' requests for discovery and for permission to present testimony at the hearing. It declared that the hearing would be limited to the condemnation issues raised in

27

Transcontinental's motions—specifically, the "legal issues surrounding [Transcontinental's] authority to condemn under the Natural Gas Act." "[A]rgument regarding compensation" would not be heard. Given the "discrete issue" to be argued, the district court concluded that "witness testimony at the hearing [would] not [be] appropriate," and that "discovery prior to the hearing [was] not warranted." In accordance with that order, the hearing on Transcontinental's motions, which lasted more than four hours, was ultimately held on October 26, 2016.

### E.    The Hearing on Transcontinental's Motions

At the hearing on Transcontinental's motions, Defendants acknowledged that Transcontinental had a right to condemn the property interests identified in the certificate of public convenience and necessity. They argued, however, that the property interests Transcontinental sought to condemn exceeded the interests that it was allowed to condemn under the certificate of public convenience and necessity. Specifically, Defendants contended that the survey plats attached to Transcontinental's motions for summary judgment did not conform to the alignment sheets approved by FERC. They also contended that the legal descriptions of the easements, as presented in Transcontinental's complaints, did not "comport with the rights allowed [to be condemned] by FERC." Defendants also attacked the sufficiency of Transcontinental's complaints, arguing that the

28

interests Transcontinental sought to condemn were not "legally cognizable" as easements because Georgia law requires easements to be described in much greater specificity than Transcontinental had provided.

Defendants further argued that Transcontinental had failed to show that it could not acquire the necessary easements by contract because the interests that Transcontinental had sought to purchase by contract were broader than what was necessary to construct the pipeline, and broader than what FERC had authorized Transcontinental to condemn. Moreover, Defendants argued that Transcontinental's descriptions of the easements it sought to purchase were so vague that its offers to purchase those easements were not even valid offers under Georgia contract law.

With respect to Transcontinental's motion for a preliminary injunction, Defendants argued that Transcontinental had failed to show that any harm it would suffer in the absence of an injunction would be irreparable, as Transcontinental's alleged harm was largely economic in nature, and any failure to meet the in-service deadline was a result of Transcontinental having set that deadline too early. They also asserted that, if an injunction were granted, Transcontinental should be required to make a cash deposit with the court before it entered any Defendant's property.

29

**F.    The District Court's Rulings on Transcontinental's Motions**

In an order entered two weeks after the four-hour hearing, and after having received Defendants' responses and documentary evidence in opposition to each of Transcontinental's motions, the district court concluded that Transcontinental was entitled to condemn Defendants' properties, but only to the extent depicted on the relevant alignment sheets and survey plats.  The district court reasoned that, to establish a right to condemn under the Natural Gas Act, Transcontinental was required to prove that:  (1) it held a valid certificate of public convenience and necessity; (2) the property to be condemned was necessary for the Dalton Expansion Project; and (3) it could not acquire the necessary easements by contract.  With respect to the first element, the district court concluded that the certificate of public convenience and necessity produced by Transcontinental was final and enforceable, as neither FERC nor any federal court of appeals had stayed, modified, or reversed FERC's issuance of that certificate.

As to the second element, the district court rejected Defendants' argument that Transcontinental's complaints, along with the survey plats and legal descriptions attached to those complaints, insufficiently described the easements for purposes of condemnation.  The court further reasoned that the property would be deemed necessary for the Dalton Expansion Project if it was part of the right-of-way or work area approved by FERC.  Because FERC had approved the

30

alignment sheets when it issued the certificate, the court concluded, the property depicted on those alignment sheets was necessary for the Dalton Expansion Project. The district court also observed that there was "no evidence that the geographic location depicted on the survey plats and legal descriptions are wrong in relation to the FERC-approve alignment sheets." Rather, the court noted that the declarations produced by Transcontinental "establish[ed] that the areas of the permanent pipeline easements and temporary construction easements depicted in [the] survey plats and legal descriptions conform[ed] to the alignment sheets approved by FERC." Accordingly, the court concluded that the right-of-way and work areas depicted on the survey plats were necessary for the Dalton Expansion Project, and there was no genuine "dispute of material fact regarding the location of the easements sought."

With respect to the third element, the district court concluded that Transcontinental had established that it could not acquire the necessary easements by contract, as it was undisputed that the parties had not reached an agreement for the easements. It noted that the evidence showed that Transcontinental had worked for more than a year to meet with property owners and negotiate contracts, and that it had been able to acquire more than 75% of the necessary easements through such negotiations. Moreover, Transcontinental had introduced evidence indicating that it offered to purchase the easements at market value. Notwithstanding those

31

efforts, it was undisputed that the parties to these cases had been unable to reach an agreement.

Having found no genuine dispute of material fact as to these matters, the district court granted Transcontinental's motion for partial summary judgment, concluding that Transcontinental had a right to condemn the property depicted on the alignment sheets and survey plats. Defendants did win a significant victory, however, in that the district court expressly declined to adopt Transcontinental's proposed easement terms or any "interpretations that would allow" Transcontinental to place the pipeline anywhere other than the locations depicted on the alignment sheets and survey plats.

The district court also granted Transcontinental's motion for a preliminary injunction. It concluded that, by demonstrating an entitlement to summary judgment, Transcontinental had already established a substantial likelihood of success—indeed, actual success—on the merits of its condemnation claim. It further concluded that both the economic and reputational harm that Transcontinental would suffer if it missed its in-service deadline were irreparable. It rejected Defendants' argument that Transcontinental could not seek equitable relief to prevent such harm because it had played a role in setting the in-service deadline. The district court reasoned that Transcontinental's role in setting that deadline did not amount to "unclean hands" because in-service deadlines "are not

32

simply agreed to as a matter of bilateral contract in this context," as they are "driven by customers' seasonal gas and heating requirements and are a prerequisite to final FERC approval given the requirement of 'open season' bidding periods for gas supply contracts."

The district court further concluded that the injuries Transcontinental would suffer absent an injunction outweighed any injury Defendants would suffer from Transcontinental having access to their properties sooner rather than later. Transcontinental had produced evidence indicating that delays in construction would cost it hundreds of thousands of dollars per day. By contrast, the district court reasoned that any harm suffered by Defendants consisted of "the difference between losing possession immediately as opposed to losing possession after compensation is determined." The district court estimated that such damages were likely to be "slight at best given assurances of adequate compensation through bond."

Finally, the district court concluded that an injunction would not be adverse to the public interest. It noted FERC's declaration in the certificate of public convenience and necessity that "[b]ased on the benefits the project will provide and the minimal adverse impacts on existing shippers, other pipelines and their captive customers, and landowners and surrounding communities, [FERC had found], consistent with the Certificate Policy Statement and NGA section 7(c), that

33

the public convenience and necessity require[d] approval of [Transcontinental's] proposal." It further noted that the Dalton Expansion Project would provide "substantial benefits to the local economy," generating approximately $450 million in economic activity within the State of Georgia and employing 2,170 workers during the construction phase.

In light of those conclusions, the district court determined that Transcontinental was entitled to a preliminary injunction granting it immediate access to Defendants' properties, but the court limited such access to the locations depicted on the alignment sheets and survey plats. The district court further provided that Transcontinental could not enter any of the properties until it posted a bond equal to twice the appraised value of each property's easement. Because the parties had not yet submitted any documentation of the properties' appraised values, the district court ordered the parties to file a joint motion with an appraised value for each property's easement, and a proposed order directing Transcontinental to pay the appropriate bond. The district court noted that the appraisals would not bind any party during the compensation stage of the litigation.

Shortly before the due date for the parties' joint motion on bond, Defendants filed a motion for an extension of time. Defendants asserted that, because the proposed easement terms described in Transcontinental's final offers and in the attachments to Transcontinental's complaint "contained ambiguities" and

"uncertainties," many of the Defendants had avoided hiring appraisers until after the October 26, 2016, hearing. Defendants also stated that, because the district court declined to adopt Transcontinental's proposed easement terms, those appraisals that had been completed needed to be reevaluated. Moreover, Defendants asserted that, because the due date for the joint motion fell immediately after the Thanksgiving holiday, many appraisers were unavailable. The district court denied the motion.

Unable to agree with most Defendants as to a bond amount, Transcontinental filed its own motions with appraised values for each of the easements by the deadline set by the court. Those values came from reports prepared by professional appraisers between November 2015 and October 2016. Transcontinental attached those reports to its motions.[7] Transcontinental proposed to satisfy its bond obligation by posting a surety bond in twice the appraised value of the easements.

Between November 23, 2016, and November 29, 2016, Defendants filed their own notices and motions with proposed bond amounts.[8] With the exception

---

[7] In only three cases did Transcontinental not submit a report prepared by a professional appraiser. In those cases, the parties did not dispute the amount that Transcontinental should post before accessing the relevant properties.

[8] Some Defendants filed "joint" motions with Transcontinental in which they disputed Transcontinental's valuation of their properties and proposed their own valuations for purposes of determining a bond amount.

35

of one Defendant, who was himself a real-estate professional, Defendants did not provide any professional estimate of the values of the easements. In addition, Defendants requested that Transcontinental be required to make a cash deposit rather than posting a surety bond. Defendants also requested that Transcontinental be required to notify them at least 48 hours in advance of any activities on their properties.

In an order entered on December 2, 2016, the district court denied Defendants' request that Transcontinental be required to make a cash deposit, concluding that a surety bond would be "acceptable and sufficient to protect Defendants' adequate compensation." It also set the amount of bond Transcontinental would be required to post before entering each Defendant's property. Where the parties had agreed on the appraised value of the easement, the district court adopted that value to determine bond. Where the parties had disagreed, the district court weighed the evidence presented in support of each party's valuation, affording greater weight to the opinions of real-estate professionals. It ultimately required Transcontinental to post a surety bond in the total amount of $1,152,196 before entering any of the Defendants' properties.

The district court granted Defendants' request for pre-access notice, and ordered Transcontinental to provide Defendants written notice at least 48 hours before entering or taking possession of their properties. Transcontinental was

required to provide a description of the "nature and duration" of the activities it intended to conduct on the properties, as well as contact information for a person with site-specific authority over Transcontinental's activities on the property.

### G.    Subsequent Proceedings and Developments

In compliance with the district court's order, Transcontinental posted a surety bond on December 6, 2016, with Liberty Mutual Insurance Company acting as surety. Transcontinental also sent a letter to Defendants stating that it anticipated entering their properties on or about December 9, 2016, to begin construction. According to that letter, construction activity would begin primarily with staking, and activity was likely to slow during the holiday season. Construction would then resume in earnest on or about January 4, 2017. Transcontinental estimated that construction would take approximately 9 to 12 months. Once construction was complete, remediation would begin. Transcontinental also provided contact information for an individual with site-specific authority over its activities on the properties.

On December 12, 2016, 34 Defendants filed a joint notice of appeal. These Defendants also moved the district court to stay its order allowing Transcontinental to immediately enter their properties pending the resolution of their appeal. In that motion, Defendants asserted that Transcontinental's letter was insufficient to satisfy the pre-access notice requirement in the district court's December 2, 2016,

order.  They asked that Transcontinental be required to give them notice in advance of each time that it planned to enter their properties, and to describe the activity that would occur on each occasion.  They pointed out that many of them had children and would be hosting extended family for the holidays, and argued that the "generic" notice Transcontinental had provided was insufficient to allow them to plan around Transcontinental's activities on their properties.  The district court temporarily stayed its orders pending its ruling on Defendants' motion.

In response to Defendants' motion, Transcontinental produced a declaration from the Dalton Expansion Project's project manager stating that Transcontinental intended to stake all Defendants' properties within 10 days after being granted access.  Accordingly, Transcontinental provided notice to all Defendants that it would be entering their properties on December 9, 2016.  He further stated that Transcontinental would provide "each landowner with a minimum of 48 hours' additional notice" before using any heavy equipment on the property.

On January 24, 2017, the district court lifted its temporary stay and denied Defendants' motion for a stay pending appeal.  The district court also concluded that Transcontinental's December 2016 letter was sufficient to satisfy the pre-access notice requirement in its December 2, 2016, order.

Defendants then filed a motion in this Court seeking a stay of the district court's orders pending the resolution of their appeal.  This Court temporarily

38

stayed the district court's orders pending a ruling on Defendants' motion. On February 2, 2017, this Court vacated its temporary stay and denied Defendants' motion for a stay pending appeal.

Without a stay in place, as of February 2, 2017, Transcontinental had access to Defendants' properties. The pipeline is now installed and in operation. Transcontinental has continued to negotiate with the Defendants, and has now reached agreements with more than 90% of the affected landowners. The appeal of 23 condemnation actions currently remain in this case. None of these Defendants have received any compensation for Transcontinental's use of their land. Although they do not ask us to order Transcontinental to remove the pipeline, they do ask that we order Transcontinental to stop the flow of gas through the pipeline on their properties, which they consider to be a continuing trespass, until they are compensated and title is transferred to Transcontinental.

## DISCUSSION

### I. The Permissibility of a Preliminary Injunction in Eminent Domain Proceedings Under the Natural Gas Act

As an initial matter, we must decide whether the issuance of a preliminary injunction granting a pipeline company access to a landowner's property before the conclusion of condemnation proceedings is legally permissible. This is a question of law that we review *de novo*. *See S. Nat. Gas Co. v. Land, Cullman Cty.*, 197 F.3d 1368, 1372 (11th Cir. 1999).

39

Every circuit that has addressed this issue has held that a preliminary injunction granting immediate access is permissible so long as the pipeline company's right to condemn the property has been finally determined, such as through the grant of a motion for summary judgment, and all other requirements for issuance of a preliminary injunction have been met. *See Transcontinental Gas Pipe Line Co., LLC v. Permanent Easements*, __ F.3d __, 2018 WL 5571434, at *6 (3d Cir. Oct. 30, 2018); *Columbia Gas Transmission, LLC v. 1.01 Acres*, 768 F.3d 300, 314–16 (3d Cir. 2014); *All. Pipeline L.P. v. 4.360 Acres of Land*, 746 F.3d 362, 368–69 (8th Cir. 2014); *Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop.*, 550 F.3d 770, 776–78 (9th Cir. 2008); *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 823–30 (4th Cir. 2004); *cf. N. Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469, 471–72 (7th Cir. 1998) (concluding that a pipeline company could not obtain a preliminary injunction allowing immediate possession of the defendants' properties because it did not first demonstrate a substantive entitlement to immediate possession). We join those circuits in holding that a district court may, in appropriate circumstances, issue a preliminary injunction granting a pipeline company immediate access to property that it has an established right to condemn under the Natural Gas Act.

As a general matter, "the equitable powers of federal courts should be broadly construed to afford complete relief under a statute." *Lewis v. Fed. Prison*

*Indus., Inc.*, 953 F.2d 1277, 1285 (11th Cir. 1992).  Accordingly, when a party

seeks an equitable remedy from the district court, the district court is presumed to

have the authority to grant the requested relief, absent some indication in the

underlying statute that such relief is not available.  *See AT&T Broadband v. Tech*

*Commc'ns, Inc.*, 381 F.3d 1309, 1316 (11th Cir. 2004) ("[U]nless the underlying

statute clearly and validly limits the equitable jurisdiction of the district court, 'all

the inherent equitable powers of the District Court are available for the proper and

complete exercise of that jurisdiction.'" (quoting *Porter v. Warner Holding Co.*,

328 U.S. 395, 398 (1946))).  The question, then, is whether the "fairest reading" of

the statute "'display[s] a[n] intent to foreclose' the availability of equitable relief."

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1386 (2015)

(alterations in original) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,

535 U.S. 635, 641 (2002)).

Section 7(h) of the Natural Gas Act states:

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts.  The practice and procedure in any action or proceeding for that purpose in the district court of the United States

41

> shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated:  *Provided*, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

15 U.S.C. § 717f(h) (emphasis in original).  Translated:  an entity holding a certificate of public convenience and necessity to construct a natural gas pipeline can proceed in federal court to acquire easements necessary for that project, so long as the value of the easement exceeds $3,000.

There is nothing in § 717f(h), or anywhere else in the Natural Gas Act, indicating that Congress intended to foreclose the district court from issuing a preliminary injunction granting a pipeline company immediate access to property for which it has established a right to condemn under the Act.  *See* 15 U.S.C. §§ 717–717w.  Like four other circuits,[9] we have held that the state-practice-and-procedure clause in § 717f(h) has been superseded by Rule 71.1 of the Federal Rules of Civil Procedure.  *See S. Nat. Gas*, 197 F.3d at 1375.  Accordingly, "the practices and procedures of federal eminent domain actions, including those filed pursuant to the Natural Gas Act, 15 U.S.C. § 717f(h), are governed by Rule [71.1] and not by state law."[10]  *Id.*

---

[9]  *See All. Pipeline*, 746 F.3d at 367; *Transwestern Pipeline*, 550 F.3d at 776 n.7; *Sage*, 361 F.3d at 822; *N. Border Pipeline Co. v. 64.111 Acres of Land*, 344 F.3d 693, 694 (7th Cir. 2003).

[10]  Rule 71A, discussed in *Southern Natural Gas*, was renumbered as Rule 71.1 in 2007. Fed. R. Civ. P. 71.1 advisory committee's note to 2007 amendment.

42

Like the Act itself, nothing in Rule 71.1 indicates that Congress intended to limit a district court's authority to issue a preliminary injunction in condemnation proceedings under the Natural Gas Act.  Indeed, Rule 71.1(a) expressly states that the other Rules of Civil Procedure apply in federal condemnation proceedings unless Rule 71.1 itself provides a governing rule.  Further, Rule 65 expressly permits district courts to issue preliminary injunctions so long as certain procedural requirements are met.  Although Rule 65 cannot itself create a substantive right to condemn where such a right is otherwise lacking, *see, e.g.*, *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–23 (1999), once a pipeline company's right to condemn a particular piece of property has been finally determined, a preliminary injunction is an appropriate vehicle to grant "some or all of the substantive relief sought in the complaint," *see Birmingham Fire Fighters Ass'n 117 v. City of Birmingham*, 603 F.3d 1248, 1254 (11th Cir. 2010) (quoting *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1358 (11th Cir. 2008)); *see also Transwestern Pipeline*, 550 F.3d at 775–77; *Sage*, 361 F.3d at 823–24.

We therefore hold that district courts retain their equitable authority to issue preliminary injunctions in condemnation proceedings brought under the Natural Gas Act, 15 U.S.C. § 717f(h).  Having so held, we must next decide whether the district court abused its discretion in issuing a preliminary injunction in this case.  To do so, however, we must first turn to the district court's grant of partial

43

summary judgment as to Transcontinental's right to condemn Defendants' properties, because that decision formed the basis for the injunction.[11]

## II.    The District Court's Grant of Partial Summary Judgment

### A.    Standard of Review

We review a district court's grant of partial summary judgment *de novo.* *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).  We apply the same standard as the district court, considering the evidence in the light most favorable to the nonmoving party, and drawing all reasonable inferences in that party's favor.  *Id.*  Summary judgment is appropriate when there is no genuine issue of material fact and the evidence on file shows that the moving party is entitled to judgment as a matter of law.  *Id.*

In opposing a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Where the record taken as a whole could not lead a rational trier of fact to

---

[11]  We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1), which permits an immediate appeal from an order granting or denying an injunction.  *See* 28 U.S.C. § 1292(a)(1).  Because the district court's grant of summary judgment provided the basis for its conclusion that Transcontinental had satisfied the first prong of the preliminary-injunction analysis, we have pendent jurisdiction to review the district court's summary-judgment ruling.  *See Sierra Club*, 526 F.3d at 1359 (concluding that this Court had pendent appellate jurisdiction to review a district court's grant of summary judgment in an interlocutory appeal from the grant of a preliminary injunction because "the summary judgment grant provided the basis for the injunction").

find for the nonmoving party, there is no genuine issue for trial. *Id.* at 587. In other words, if the evidence produced by the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

### B.     The Elements of a Claim for Condemnation Under the Natural Gas Act

Section 7(h) of the Natural Gas Act allows "any holder of a certificate of public convenience and necessity" to acquire by eminent domain "the necessary right-of-way to construct, operate, and maintain" a pipeline "for the transportation of natural gas," so long as the holder "cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for," that necessary right-of-way. 15 U.S.C. § 717f(h). Accordingly, in order to condemn a particular piece of property under the Natural Gas Act, a party must demonstrate that: (1) it holds a valid certificate of public convenience and necessity; (2) the property to be condemned is necessary for the natural-gas pipeline authorized by the certificate; and (3) it cannot acquire the necessary easements by contract. *See id.*

Thus, in order to prevail on its motion for partial summary judgment, Transcontinental was required to show that: (1) it holds a valid certificate of public convenience and necessity authorizing the Dalton Expansion Project; (2) the property to be condemned was necessary for the Dalton Expansion Project; and

45

(3) it could not acquire by contract the easements necessary to complete the Dalton Expansion Project. *See* 15 U.S.C. § 717f(h).

> ### 1.    Whether Transcontinental holds a valid certificate of public convenience and necessity

The district court concluded that the certificate of public convenience and necessity produced by Transcontinental was final and enforceable, as neither FERC nor any federal court of appeals had stayed, modified, or reversed FERC's issuance of that certificate. Defendants do not challenge that conclusion on appeal.[12] Accordingly, only the second and third elements—whether the property to be condemned was necessary for the Dalton Expansion Project and whether Transcontinental showed an inability to acquire the necessary easements by contract—are at issue in this appeal.

> ### 2.    Whether the property to be condemned was necessary for the Dalton Expansion Project

Transcontinental sought to condemn the property legally described and depicted on the survey plats attached to its complaints. The district court reasoned that the property depicted on those survey plats was necessary for the Dalton Expansion Project if that property was part of the right-of-way or work area

---

[12] Defendants make only one reference to the certificate's validity in their initial brief on appeal, asserting, without explanation, that "the FERC Certificate itself is not even final." Defendants' passing reference to that issue in their brief, without any discussion or citation of authority, is insufficient to raise the issue on appeal. *See, e.g.*, *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318–19 (11th Cir. 2012); *Singh v. U.S. Att'y Gen.*, 561 F.3d 1275, 1278–79 (11th Cir. 2009); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

approved by FERC.  In granting Transcontinental a certificate of public convenience and necessity, FERC had approved certain alignment sheets depicting that right-of-way and work area.  Accordingly, the district court reasoned that, so long as the survey plats matched the alignment sheets, the property depicted on the survey plats was necessary for the Dalton Expansion Project.

Reviewing the evidence, the district court concluded that the declarations produced by Transcontinental "establish that the areas of the permanent pipeline easements and temporary construction easements depicted in [the] survey plats and legal descriptions conform to the alignment sheets approved by FERC."  Having found "no evidence that the geographic location depicted on the survey plats and legal descriptions [were] wrong in relation to the FERC-approved alignment sheets," the district court held that the property legally described and depicted on the survey plats was necessary for the Dalton Expansion Project.  Notably, the court expressly rejected any effort to condemn any property that was not legally described and depicted on those survey plats.

Defendants challenge the district court's ruling on the ground that discovery was necessary to determine whether the property that Transcontinental sought to condemn conformed to the right-of-way approved by FERC.  Accordingly, they argue, the district court erred in not allowing them to conduct discovery before ruling on Transcontinental's motion for partial summary judgment.

47

(a)     *Whether the district court abused its discretion in ruling on Transcontinental's motion for summary judgment without first allowing Defendants to engage in discovery*

Generally, a district court should allow discovery before ruling on a motion for summary judgment. *See Jones v. City of Columbus*, 120 F.3d 248, 253 (11th Cir. 1997) ("The law in this circuit is clear:  the party opposing a motion for summary judgment should be permitted an adequate opportunity to complete discovery prior to consideration of the motion.").  Nevertheless, whether to allow discovery before ruling on a motion for summary judgment is ultimately a matter committed to the discretion of the district court. *See Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000); *see also Wallace v. Brownell Pontiac-GMC Co., Inc.*, 703 F.2d 525, 527–28 (11th Cir. 1983) (explaining that the Federal Rules of Civil Procedure contemplate a situation where a party is faced with a motion for summary judgment before discovery has been had, and the decision whether to delay a ruling and allow discovery in such circumstance is "committed to the sound discretion of the trial judge").

Under the abuse-of-discretion standard, this Court will leave undisturbed a district court's ruling unless the district court has made a clear error of judgment or has applied the wrong legal standard. *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1307 (11th Cir. 2011).  Moreover, discovery rulings will not be overturned unless it is shown that they resulted in "substantial harm to the

48

appellant's case." *Id.* (quoting *Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1286 (11th Cir. 2003)).

We conclude that the district court did not abuse its discretion in ruling on Transcontinental's motion for summary judgment without first allowing Defendants to engage in discovery. First, the parties agree that Transcontinental had a right to condemn the property that was depicted on the FERC-approved alignment sheets. Indeed, to defeat that right, Defendants would have had to make its challenge to FERC's chosen right-of-way before FERC in the first instance, subject to review by this Court or the D.C. Circuit on a party's petition for review. *See* 15 U.S.C. § 717r(a)–(b); *Berkley v. Mountain Valley Pipeline, LLC*, No. 18-1042, 2018 WL 3551975, at *1–3 (4th Cir. July 25, 2018); *Transwestern Pipeline*, 550 F.3d at 778 n.9; *Williams Nat. Gas Co. v. City of Oklahoma City*, 890 F.2d 255, 260–64 (10th Cir. 1989). Defendants did not do so.

Nor do the parties disagree that Transcontinental could build a pipeline in the geographic location depicted on the FERC-approved alignment sheets for the limited purpose of transporting natural gas. Instead, what Defendants do dispute—and contend that discovery was necessary to determine—is (1) whether the alignment sheets attached to Transcontinental's motion for summary judgment

49

were approved by FERC and (2) whether the survey plats accurately reflected the FERC-approved alignment sheets.[13]

Defendants, however, do not explain how discovery would enable them to demonstrate the existence of a genuine dispute of material fact as to either the authenticity of the alignment sheets or the accuracy of the survey plats. *See Wallace*, 703 F.2d at 527 (noting that, in opposing a motion for summary judgment on the grounds that discovery is necessary, "the nonmovant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts, but rather he must specifically demonstrate how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact" (quoting *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 901 (5th Cir. 1980)) (quotation marks omitted)).

---

[13] Admittedly, Defendants advance a somewhat broader argument in their brief when they assert that "discovery was required to determine whether the property [Transcontinental] sought to condemn was even authorized by the FERC Certificate." This argument challenges not only the geographic location of the pipeline as depicted on the alignment sheets and survey plats, but also the terms that would govern the easements once granted, as well as any interpretations of Transcontinental's complaints that would allow Transcontinental to place the pipeline in a location other than that depicted on the survey plats. However, the district court's grant of summary judgment on Transcontinental's right to condemn was specifically limited to only "what is approved by the FERC Certificate and corresponding alignment sheets," including "the easements as they are mapped by survey plat and legally described." The district court expressly did not adopt Transcontinental's proposed easement terms or any "interpretations that would allow" Transcontinental to place the pipeline anywhere other than the locations depicted on the alignment sheets and survey plats. Accordingly, any challenge to the district court's ruling must be directed at either the authenticity of the alignment sheets or the accuracy of the survey plats.

50

With respect to the former, Defendants attempted to demonstrate at the hearing on Transcontinental's motions that one of the alignment sheets attached to Transcontinental's motion for summary judgment was no longer approved by FERC due to a subsequent FERC-approved relocation of the pipeline. However, the owners of that particular piece of property have been dismissed from this appeal pursuant to a joint motion for voluntary dismissal, and the remaining Defendants have not pointed to anything indicating that the alignment sheets produced by Transcontinental in their cases might be outdated or inauthentic.

With respect to the accuracy of the survey plats, Defendants challenged the accuracy of one of the plats at the hearing on Transcontinental's motions. Defendants' counsel alleged that, according to his own analysis, which he performed with a ruler the night before the hearing, the easement depicted in the survey plat for Mr. Paul Corley's property varied from the relevant alignment sheet by 20 to 40 feet. At the hearing, counsel placed the relevant alignment sheets and survey plats on the overhead projector, pointed out the alleged discrepancy, and attempted to demonstrate how, with a ruler, one could determine that the survey plats for Mr. Corley's property did not correspond to the alignment sheets.[14]

---

[14] The documents counsel used to demonstrate his approach were accepted into the record as an exhibit.

51

As evidenced by that demonstration, however, Defendants did not need discovery in order to produce evidence that the survey plats did not accurately reflect the alignment sheets. Because the survey plats were attached both to Transcontinental's complaints and to its final offer letters, and because the alignment sheets were both publicly available on FERC's website and attached to Transcontinental's motion for summary judgment, Defendants could have produced their own affidavit or declaration from a qualified expert declaring that the easements reflected in the survey plats exceeded those permissible under the alignment sheets.[15]

Accordingly, Defendants have not shown that the district court's decision to rule on Transcontinental's motion for summary judgment without first allowing discovery resulted in "substantial harm" to their case. *See Josendis*, 662 F.3d at 1307 ("[D]iscovery rulings will not be overturned 'unless it is shown that [they] resulted in substantial harm to the appellant's case.'" (alteration in original) (quoting *Iraola*, 325 F.3d at 1286)). We therefore conclude that the district court

---

[15] In their reply brief, Defendants assert that they "were afforded no opportunity to have their own certified land surveyors or project engineers review the survey plats and compare them with the alignment sheets filed with FERC." Defendants have not explained why that is the case, given that the survey plats and alignment sheets were available in the record. Furthermore, although the district court did not allow testimony at the hearing, there is no indication in the record that the district court precluded Defendants from introducing documentary evidence in opposition to Transcontinental's motions. Indeed, Defendants produced documentary evidence before the hearing, and the district court accepted certain documents into the record as exhibits at the hearing.

did not abuse its discretion in ruling on Transcontinental's motion for summary judgment without first allowing Defendants to complete desired discovery.

> (b)    *Whether the district court erred in concluding that the property to be condemned was necessary for the Dalton Expansion Project*

As noted above, the district court concluded that the declarations produced by Transcontinental "establish that the areas of the permanent pipeline easements and temporary construction easements depicted in [the] survey plats and legal descriptions conform to the alignment sheets approved by FERC." The court found "no evidence that the geographic location depicted on the survey plats and legal descriptions are wrong in relation to the FERC-approved alignment sheets," and it held that the property legally described and depicted on the survey plats was necessary for the Dalton Expansion Project.

The district court did not err in concluding that the property to be condemned was necessary for the Dalton Expansion Project. Transcontinental produced alignment sheets, survey plats, and a sworn declaration from the pipeline engineer for the Dalton Expansion Project stating that: (1) the declarant was a duly licensed Professional Engineer in 12 states; (2) the alignment sheets were prepared by consultants under his guidance; (3) he had overseen the production of the alignment sheets and had a working knowledge of them; (4) the alignment sheets submitted to the court were reviewed and approved by FERC; (5) the survey plats

53

submitted to the court were prepared by a Certified Land Surveyor in the State of Georgia retained by Transcontinental; (6) project engineering consultants worked closely with the surveyor who prepared each survey plat to ensure that the survey plats were created using the same survey data used to generate the alignment sheets; and (7) the location and dimensions of the easements depicted on the survey plats conformed to the "[p]roject path and footprint" depicted on the alignment sheets.

Although Transcontinental offered an expert's declaration to prove that the survey plats for the property to be condemned conformed with the alignment sheets approved by FERC, Defendants offered no affidavit, declaration, or evidence to rebut that testimony. Defendants' only challenge to Transcontinental's assertion occurred via its attorney's unsworn assertion that, based on his own comparison of the plats with the sheets, the two did not jibe. Clearly, that unsworn assertion by counsel, who demonstrated no expertise to reach such a conclusion, did not constitute evidence. Therefore, the district court did not err in concluding that there was no genuine issue of material fact with regard to (1) whether the alignment sheets were approved by FERC or (2) whether the survey plats accurately reflected the alignment sheets. Because there was no genuine issue of material fact as to those issues, and because the district court granted condemnation only for the easements depicted on the FERC-approved alignment

54

sheets, as reflected in the survey plats, there was also no genuine issue of material fact as to whether the property to be condemned was necessary for the Dalton Expansion Project.

### 3. Whether Transcontinental was unable to acquire the necessary easements by contract

The district court concluded that Transcontinental had established that it was unable to acquire the necessary easements by contract because it was "undisputed that the parties ha[d] not reached an agreement for the easements."  It interpreted Defendants' argument that Transcontinental had failed to make such a showing because its offer letters sought to purchase more rights than Transcontinental was entitled to condemn as an argument that Transcontinental had not negotiated in good faith.  Looking to the plain language of the statute, the district court concluded that good-faith negotiation was not required for Transcontinental to show an inability to acquire the necessary easements by contract, and held that the parties' failure to reach an agreement was itself sufficient.

Nevertheless, the district court concluded that, even if good faith was required, Transcontinental had negotiated in good faith because:  (1) the Dalton Expansion Project's project manager had stated in his declaration that Transcontinental had "been working for more than a year to meet with property owners and negotiate contracts to purchase the easements and other property rights required" for the project, and had in fact reached agreements with "a large majority

55

of [the] owners"; (2) the Dalton Expansion Project's land representative had stated in his declaration that Transcontinental had acquired more than 75% of the necessary easements through negotiation with the landowners; and (3) Transcontinental's final offer letters stated that its offers exceeded market value.

On appeal, Defendants do not challenge the district court's conclusion that a pipeline company need not demonstrate that it negotiated with landowners in good faith in order to establish that it was unable to acquire the necessary easements by contract. Indeed, Defendants expressly disclaim any argument that the Natural Gas Act requires pipeline companies to negotiate with landowners in good faith, stating in their Reply Brief: "To be clear, Landowners are not necessarily asking this Court to find that there is a good faith negotiation requirement." Therefore, we do not consider the extent to which Transcontinental's good faith—or lack thereof—bears on this particular question.[16]

---

[16] Courts are split on the issue of whether § 717f(h) contains an implied requirement of good-faith negotiation. *See All. Pipeline L.P. v. 4.360 Acres of Land*, 746 F.3d 362, 367–68 (8th Cir. 2014) (collecting cases). The Ninth Circuit has held that § 717f(h) requires a pipeline company, "[i]n addition to showing an inability to agree on a price with the landowner, [to] also establish that it engaged in good faith negotiations with the landowner." *Transwestern Pipeline*, 550 F.3d at 776 (quoting *Nat'l Fuel Gas Supply Corp. v. 138 Acres of Land*, 84 F. Supp. 2d 405, 416 (W.D.N.Y. 2000)). By contrast, the First Circuit, in an unpublished opinion, has expressly "decline[d] . . . to create" a requirement that pipeline companies negotiate in good faith before bringing a condemnation action under the Natural Gas Act. *Maritimes & Ne. Pipeline, L.L.C. v. Decoulos*, 146 F. App'x 495, 498 (1st Cir. 2005).

Instead, in their effort to rebut Transcontinental's contention that it was unable to acquire the necessary easements by contract, Defendants offer two other arguments. First, they contend that, in the offers that Transcontinental made to them, Transcontinental sought to purchase more rights than it was entitled to condemn under the FERC-issued certificate of public convenience and necessity. Accordingly, they argue, Transcontinental has only shown that it could not acquire the easements it wanted, and has not shown that it could not acquire the easements to which it was entitled and which were necessary for completion of the Dalton Expansion Project. Second, Defendants argue that Transcontinental's descriptions of the easements it sought to purchase were so vague that they could not be valued under Georgia law and, therefore, any pre-suit offer to purchase such interests was not really an offer at all.[17] We address each argument in turn.

> (a)    *Whether Transcontinental failed to establish its inability to acquire the necessary easements by contract because*

---

[17] To the extent that Defendants challenge the adequacy of the survey plats as a legal description of the relevant easements for purposes of condemnation, their challenge must fail. This Court has held that Rule 71.1 of the Federal Rules of Civil Procedure governs the adequacy of a legal description in federal condemnation proceedings under the Natural Gas Act. *S. Nat. Gas*, 197 F.3d at 1375. In *Southern Natural Gas*, this Court concluded that "a legal description and a plat map showing the placement of the pipeline and relevant easements" was sufficient to satisfy the requirements of Rule 71.1. *Id.* Accordingly, any challenge to the adequacy of the survey plats as a legal description of the easements for purposes of condemnation is foreclosed by *Southern Natural Gas*. *See id.*

57

> *its pre-suit offers sought to purchase more rights than it*
> *could acquire through eminent domain*

In its Final Offer to Acquire Pipeline Right of Way, Transcontinental sought to purchase an easement to transport "gas, oil, petroleum products, or any other liquids, gases, or substances which can be transported through pipelines." Yet, Transcontinental's certificate of public convenience and necessity specifically states that "[Transcontinental's] right of eminent domain granted under NGA section 7(h) does not authorize it to . . . acquire a right-of-way for a pipeline to transport a commodity <u>other than natural gas</u>." (emphasis added). Accordingly, by seeking an easement to transport substances other than natural gas, Transcontinental sought to purchase more rights than it could receive under eminent domain, with the latter allowing it an easement only to transport natural gas.

Defendants cite no authority in support of their argument that, because Transcontinental offered to purchase more rights than it was entitled to condemn, Transcontinental has failed to demonstrate an inability to acquire the *necessary* easements by contract.[18] Notably, FERC does not require pipeline companies to

---

[18] In the district court, Defendants relied on *Sabal Trail Transmission, LLC v. 7.72 Acres in Lee Cty.*, No. 3:16-CV-173-WKW, 2016 WL 3248666 (M.D. Ala. June 8, 2016). However, in that case, the plaintiff pipeline company had originally submitted incorrect descriptions of the relevant easements that all parties acknowledged did not follow the FERC alignment sheets. *Id.* at *6. The plaintiff later submitted a corrected description that did reflect the alignment sheets, but a dispute remained as to whether the plaintiff had offered to purchase the easements depicted in its original filing or the easements depicted in its corrected filing. *Id.* at *6–7. Here, as

limit their pre-suit offers to those rights that the companies would be entitled to condemn under the relevant certificate of public convenience and necessity. Landowner Notification, Expanded Categorical Exclusions, and Other Environmental Filing Requirements, 64 Fed. Reg. 57,374, 57,388–89 (Oct. 25, 1999).

Defendants pay lip service to the above principle, stating that they do not disagree that a pipeline company armed with a FERC certificate "may seek to acquire greater easement rights than those allowed under the FERC Certificate." They quarrel with the fact that Transcontinental did not make an alternative offer that would have limited it to transporting only natural gas. Yet Defendants have not indicated that they proffered any evidence before the district court indicating that the absence of an alternative offer limited to a right to transfer only natural gas had any impact on the negotiation process between them and Transcontinental. Defendants do assert in their reply brief that, had they "been permitted to introduce evidence, they could have made a showing that prior to condemnation they directly requested from [Transcontinental], repeatedly in some cases, an offer limited to the rights [Transcontinental] was permitted to condemn." However, Defendants do not explain why they were unable to produce such evidence in opposition to

explained above, there is no genuine issue of material fact as to whether the survey plats attached to the complaint and to Transcontinental's offer letters accurately reflected the relevant FERC-approved alignment sheets.

59

Transcontinental's motion for summary judgment, either through an affidavit or a declaration attesting to the existence of such requests.

Nor have Defendants indicated that they made, or were willing to make, a counteroffer limited to the easement rights depicted in the alignment sheets and described in the certificate of public convenience and necessity. *Cf. All. Pipeline*, 746 F.3d at 368 (noting, in concluding that a pipeline company had negotiated with landowners in good faith, that the landowners had never made a counteroffer or attempted to negotiate with the company after the company had made an offer to purchase an easement). In fact, Defendants have not even asserted the likelihood that, although they had rejected Transcontinental's offer for easement rights that would have permitted the company to transport all manner of substances through the pipeline, they would have accepted an offer from Transcontinental that was limited to the transportation of natural gas.[19] As one might assume that Transcontinental would offer less compensation for a narrower interest, it would seem that Defendants would have found such an offer even less appealing than the original larger offer they had rejected.[20]

---

[19] Defendants offer only the observation, "As the saying goes, you never know until you try."

[20] We reiterate that, at a condemnation proceeding, Transcontinental will be entitled to an easement authorizing only the transportation of natural gas. To the extent that Transcontinental obtained agreements with other owners to transport additional substances, Transcontinental will be required to obtain an agreement from Defendants to do the same, should Transcontinental wish to transport these additional substances in the future.

In short, we reject Defendants' argument that Transcontinental failed to establish an inability to acquire the necessary easements by contract based on its failure to make an offer to purchase only those rights it was entitled to condemn under the relevant certificate of public convenience and necessity. We thus find no error by the district court in its ruling to the same effect.

      (b)    *Whether Transcontinental's pre-suit offers were so vague that Transcontinental cannot be said to have even attempted to acquire the necessary easements by contract*

Defendants also argue that Transcontinental's descriptions of the easements it sought to purchase were so vague that Transcontinental's offers were not valid offers under Georgia contract law. Whether a pre-suit offer to purchase an easement actually constitutes an offer for which acceptance might form an enforceable agreement is an issue of state law. *See Grange Mut. Cas. Co. v. Woodard*, 861 F.3d 1224, 1226–27, 1230–33 (11th Cir. 2017) (applying Georgia law to the issue of whether a pre-suit offer to settle certain tort claims was accepted by the offeree); *Hall v. Coram Healthcare Corp.*, 157 F.3d 1286, 1289 & n.25 (11th Cir. 1998) (concluding that a settlement agreement entered into in a federal securities class action in Georgia was governed by Georgia law).

Defendants rely on three cases to support their argument that Transcontinental's descriptions of the proposed easements were so vague that any offer to purchase those easements was not a valid offer under Georgia law.

61

However, none of those cases address the specificity with which an express easement must be described in a contract between two willing parties. Rather, each case concerns the specificity required to condemn an easement in Georgia's courts. *See City of Atlanta v. Airways Parking Co.*, 167 S.E.2d 145, 149–50 (Ga. 1969) (holding that a condemnation petition did not adequately describe the easements to be condemned because it neither identified the location of the easements in relation to the rest of the property nor provided meaningful information about the extent or duration of temporary construction activities to take place on the property); *Ga. 400 Indus. Park, Inc. v. Dep't of Transp.*, 616 S.E.2d 903, 906–07 (Ga. Ct. App. 2005) (concluding that the description of an easement in a declaration of taking was insufficient because it provided neither the width of the easement nor any limitation on the pathway that would be utilized when traversing land not condemned); *Mosteller Mill, Ltd. v. Ga. Power Co.*, 609 S.E.2d 211, 213–14 (Ga. Ct. App. 2005) (concluding that a condemnation petition providing for a "nonspecific and undefined 'danger tree' maintenance easement" failed "to describe the condemned land for maintenance with the required specificity to convey an easement in land").

Defendants have cited no authority holding that contracts for express easements are void if they do not describe the easements with the specificity required in condemnation proceedings. *Cf. Wilann Props. I, LLC v. Ga. Power*

62

*Co.*, 740 S.E.2d 386, 390 & n.2 (Ga. Ct. App. 2013) (rejecting the argument that an express easement was invalid because the document conveying the easement did not describe it with the specificity required in condemnation proceedings).  In fact, the Georgia Court of Appeals has upheld express easements for pipelines and other utility lines where the precise location of the right-of-way was "indefinite" until the line was actually installed.  *See, e.g.*, *id.* at 390; *see also Nodvin v. Plantation Pipe Line Co.*, 420 S.E.2d 322, 327 (1992) ("[W]here the grant of a pipeline easement is general as to the location of the pipe and its size, it becomes fixed and certain after the pipe is laid and is used with the acquiescence of both grantor and grantee." (citation omitted)), *overruled in part on other grounds by Yaali, Ltd. v. Barnes & Noble, Inc.*, 506 S.E.2d 116 (1998); *cf. Sloan v. Rhodes, LLC*, 560 S.E.2d 653, 655–56 (Ga. 2002) (directing the trial court to determine whether the width of an easement for a "proposed street," which did not exist at the time the easement was conveyed, was defined by the parties when the street was "established" a number of years later).

Here, Transcontinental offered to purchase the easements depicted on the survey plats that were attached to its offer letters.  Although Transcontinental indicated that the survey plats were "preliminary," and that the final location of the easements would "be fixed and determined by the initial pipeline as installed on Grantor's Land," Transcontinental's offers were not so vague and indefinite as to

render any easements conveyed by the acceptance of those offers void under Georgia law. *See Wilann Props.*, 740 S.E.2d at 390; *Nodvin*, 420 S.E.2d at 327. Accordingly, Defendants' argument that Transcontinental's descriptions were so vague as to render its offers invalid—thereby demonstrating that Transcontinental failed to attempt to acquire the necessary easements by contract—is without merit.

In short, the district court did not err in concluding that there was no genuine issue of material fact as to whether: (1) Transcontinental held a valid certificate of public convenience and necessity; (2) the property to be condemned was necessary for the natural-gas pipeline authorized by the certificate; and (3) Transcontinental could not acquire the necessary easements by contract. *See* 15 U.S.C. § 717f(h). Accordingly, the district court properly granted Transcontinental's motion for partial summary judgment.

## III.   The District Court's Issuance of a Preliminary Injunction

### A.   Standard of Review

A district court's grant of a preliminary injunction is reviewed for abuse of discretion. *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014); *see also Cunningham v. Adams*, 808 F.2d 815, 819 (11th Cir. 1987) ("The grant or denial of a preliminary injunction rests within the sound discretion of the district court and is reversible on appeal only for an abuse of that discretion or if contrary to some rule of equity."). Any findings of fact underlying the grant of an

64

injunction are reviewed for clear error, and any legal conclusions are reviewed *de novo*. *Hudgens*, 742 F.3d at 1329.

## B.    The Requirements for Issuance of a Preliminary Injunction

A district court may grant a preliminary injunction only if the moving party shows that:  (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Id.*  A preliminary injunction is "an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion for each prong of the analysis." *Id.* (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)) (quotation marks omitted). Nevertheless, our review of the district court's decision is "very narrow," and we will not reverse "unless there is a clear abuse of discretion." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005) (quoting *Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 740 F.2d 892, 893 (11th Cir. 1984)).

Because the district court properly granted summary judgment in favor of Transcontinental on its right to condemn Defendants' properties, the first factor— whether Transcontinental has a substantial likelihood of success on the merits—is

65

no longer at issue.  We therefore turn to the remaining equitable factors in the preliminary-injunction analysis.

## C.    Whether Transcontinental Established That It Would Suffer Irreparable Injury Absent an Injunction

The district court concluded that Transcontinental would suffer irreparable economic and reputational harm absent an injunction.  With respect to economic harm, the district court noted that the Dalton Expansion Project's project manager had stated in his declaration that, if construction were delayed or interrupted, Transcontinental would incur "irrecoverable costs of hundreds of thousands of dollars per day," particularly if it missed its in-service deadline.  Because Transcontinental had no remedy at law to recover any costs caused by delay, the district court concluded that these economic damages would be irreparable.  With respect to reputational harm, the project manager declared that Transcontinental faced "a significant risk of damage to its reputation, competitive standing, and business goodwill" if it was unable to meet its contractual obligations to the Dalton Expansion Project's primary customers.  Such injuries, the district court concluded, are generally considered to be irreparable.

On appeal, Defendants advance several arguments as to why Transcontinental failed to establish that it would suffer irreparable injury unless it was granted immediate access to their properties.  We address each argument in turn.

66

1.    Whether simultaneous access to all of Defendants' properties was necessary in order for Transcontinental to avoid irreparable injury

Defendants first argue that Transcontinental did not show that it would suffer irreparable injury absent an injunction because, given the nature of pipeline construction, Transcontinental did not need immediate access to all of their properties. According to Transcontinental's evidence, pipeline construction is a coordinated process involving several steps that must be performed sequentially. First, a survey crew must mark the area, which another crew must clear and grade. Once clearing and grading is complete, another crew excavates the pipeline trench. The pipeline is then strung along the corridor adjacent to the trench, bent to desired angles, welded, coated, and inspected. The pipeline is eventually lowered into the trench and inspected again before the trench is filled. Once the trench is filled, the pipeline is pressure-tested and, if no additional adjustments are necessary, the area is restored as nearly as possible to its original condition. Each step in this process must be complete before the next step can begin. Accordingly, crews move sequentially along the pipeline path, one behind the other, successively completing their particular tasks.

Defendants argue that, because crews must move sequentially along the pipeline's path, Transcontinental did not need immediate access to all of their properties at the time it moved for a preliminary injunction. Rather, at that time,

67

Transcontinental only needed access to those properties at the beginning of the pipeline's path. Accordingly, they argue, Transcontinental did not show that immediate access to all of their properties was necessary to avoid irreparable harm, and Transcontinental should have instead sought permission to access each landowner's property at the time that it actually needed to access that property. We disagree.

The effect of the district court's injunction in these consolidated proceedings was to grant Transcontinental permission to access each piece of property as soon as it needed such access. In other words, the district court determined that access to the properties need not await conclusion of the compensation stage of the litigation for each property. The district court did not clearly err in concluding that Transcontinental would suffer irreparable harm if it were not permitted to access the properties on the dates that it needed such access, even if those dates were not imminent.

Moreover, requiring that the district court hold a separate hearing on each piece of property as Transcontinental's construction crews progressed toward that property would have resulted in unnecessary delay and duplication of effort, without any corresponding benefit. Having been granted summary judgment entitling it to easement rights on all of Defendants' properties, it was only a matter of time until Transcontinental would be encroaching on each Defendant's property.

68

Requiring a court proceeding prior to each such encroachment to determine the compensation due the owner, when the summary judgment ruling clearly allowed access, would have accomplished nothing on these particular facts.

Accordingly, we conclude that the district court did not abuse its discretion in addressing all of the consolidated cases together. *See Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985) (noting that a district court has "inherent managerial power to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants" (quoting *In re Air Crash Disaster at Fla. Everglades*, 549 F.2d 1006, 1012 (5th Cir. 1977)) (quotation marks omitted)). We further conclude that Defendants' argument on this point does not negate the irreparable harm that Transcontinental would have suffered without a preliminary injunction.

> 2. <u>Whether the possibility that other factors might delay the project meant that a delay prompted by Defendants' objections would not cause irreparable harm</u>

Defendants next argue that Transcontinental did not show that it would suffer irreparable harm without an injunction because a "multitude of other potential or actual factors" could have also potentially affected Transcontinental's ability to meet its in-service deadline. For instance, Defendants contend that FERC might have potentially modified some portions of Transcontinental's certificate of public convenience and necessity, which would then have caused

69

Transcontinental to miss its in-service deadline, regardless of whether it had earlier gained immediate access to Defendants' properties.

We disagree.  The preliminary injunction in this case is concerned with avoiding harm caused by an inability to access Defendants' properties, not with the possibility that future delay could conceivably occur based on other factors that might never occur.

### 3.    Whether the harms that Transcontinental would have suffered in the absence of an injunction were reparable

Defendants next argue that Transcontinental would have suffered only economic or financial harm had an injunction not issued, and that financial harm can never be deemed irreparable.  While economic harm will not satisfy the irreparable-harm element in many cases, that general rule does not necessarily hold where there is no adequate remedy at law to recover damages for the harm suffered.  *See Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (concluding that monetary damages were irreparable because they could not be recovered against a state agency due to the agency's Eleventh Amendment immunity); *Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175, 179 (5th Cir. 1975) (concluding that economic loss was irreparable where monetary damages were not "susceptible of specific proof").

Here, Transcontinental produced a declaration asserting that an injunction was necessary because delay would cause Transcontinental to incur "irrecoverable

costs." Defendants have not rebutted that assertion by pointing to any legal remedy through which Transcontinental might recover any economic harm it would suffer from delayed access to Defendants' properties. In the absence of such a remedy, Transcontinental's economic damages, estimated to be in the hundreds of thousands of dollars per day of delay, are irreparable.

## D. Whether the Threatened Injury to Transcontinental Outweighed Any Damage the Proposed Injunction Would Cause to Defendants

The district court concluded that the injuries Transcontinental would suffer absent an injunction outweighed any injury Defendants would suffer from Transcontinental having access to their properties sooner rather than later. It noted that Transcontinental had produced a declaration stating that delays in construction would cost it hundreds of thousands of dollars per day in irrecoverable damages. With respect to Defendants' damages, the district court reasoned that the measure of any damages Defendants would suffer from an injunction would be "based on the difference between losing possession immediately as opposed to losing possession after compensation is determined." The district court estimated that such damages were likely to be "slight at best given assurances of adequate compensation through bond."

The district court did not err. Transcontinental produced evidence indicating that delays in construction would cost it hundreds of thousands of dollars per day in irrecoverable damages. The damages that a preliminary injunction would cause

71

Defendants, on the other hand, comes down only to any damages that might result from a defendant losing possession of the property in question sooner, rather than later, after compensation for the taking has been finally determined. *See Sage*, 361 F.3d at 829 (concluding that a claim that early possession would disturb the productive capacity of the land "is simply a timing argument because productive capacity would still be disturbed, albeit at a later time, if just compensation was determined first"). Yet, any damages that Defendants suffer based on the timing of the taking should be capable of determination at the compensation stage of the litigation, subject to any review on appeal from the final judgment.

In short, the record supports the district court's conclusion that any harm to Transcontinental from delay outweighed the harm Defendants would suffer from Transcontinental accessing their properties sooner rather than later, especially because Defendants should be able to recover all recoverable damages in full at the compensation stage of the litigation, while Transcontinental's damages would be irrecoverable.

## E.  Whether an Injunction Granting Transcontinental Immediate Access to Defendants' Properties Would Be Adverse to the Public Interest

The district court concluded that an injunction granting Transcontinental immediate access to Defendants' properties would not be adverse to the public interest. It noted FERC's declaration in the certificate of public convenience and

necessity that, "[b]ased on the benefits the project will provide and the minimal adverse impacts on existing shippers, other pipelines and their captive customers, and landowners and surrounding communities, [FERC had found], consistent with the Certificate Policy Statement and NGA section 7(c), that the public convenience and necessity require[d] approval of [Transcontinental's] proposal." It further noted that, according to a study submitted to FERC with Transcontinental's application for a certificate of public convenience and necessity, the results of which were repeated by the Dalton Expansion Project's project manager in his declaration, construction costs for the Dalton Expansion Project were expected to generate approximately $450 million in economic activity within the state of Georgia, employing 2,170 workers in the construction phase alone. In light of these significant public benefits, the district court concluded that an injunction allowing Transcontinental immediate access to Defendants' properties would not be adverse to the public interest.

The district court did not clearly err. Transcontinental produced evidence indicating that construction costs for the Dalton Expansion Project would generate a total of approximately $450 million in economic activity within the State of Georgia, utilizing approximately 2,170 workers during the construction phase. The total new economic activity generated in Georgia was projected to be more than $3

73

million per year once the project was operational.  Any delays in construction would delay the realization of these public benefits.[21]

Accordingly, the district court did not err in concluding that an injunction would not be adverse to the public interest.

### F.    Whether the District Court Abused Its Discretion in Refusing to Apply the Doctrine of Unclean Hands

We may reverse a district court's grant of a preliminary injunction if the grant is "contrary to some rule of equity."  *Cunningham*, 808 F.2d at 819.  One such rule is the doctrine of unclean hands.  *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244–47 (1933); *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1354–55 (11th Cir. 1983).  "Application of the equitable doctrine of unclean hands lies within the sound discretion of the district court."  *Shatel Corp.*, 697 F.2d at 1355.

Defendants advance only one unclean-hands argument on appeal.  They argue that any harm Transcontinental might have suffered from failing to meet its in-service deadline was a crisis of Transcontinental's own making because

---

[21] Atlanta Gas Light Company and Oglethorpe Power Corporation have filed amicus briefs indicating that any delay in completion of the Dalton Expansion Project would impact their ability to deliver natural gas to their customers.  Atlanta Gas Light Company further asserts that, if the project were not completed before the winter of 2017–2018, the company would not be able to provide natural gas to heat hundreds of thousands of homes on Georgia's coldest winter days.  In other words, the amici argued that the substantial delay that would have resulted from delaying the project pending  resolution of each of the condemnation actions against each property owner would have been adverse to the public interest.

Transcontinental had a role in setting that deadline.  Therefore, they argue, Transcontinental should be deemed to have unclean hands as to any argument that time was of the essence and it should be precluded from seeking an equitable remedy to protect it from the consequences of its own decisions.

Rejecting this argument, the district court noted that in-service deadlines "are not simply agreed to as a matter of bilateral contract in this context," but are instead "driven by customers' seasonal gas and heating requirements" and, moreover, "are a pre-requisite to final FERC approval given the requirement of 'open season' bidding periods for gas supply contracts."  Defendants do not challenge these factual conclusions.

Indeed, it is clear that, in gaining the necessary approval to implement its project, a pipeline company must proceed on separate, overlapping tracks whose timelines the company cannot completely control.  *See Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 966, 972 (D.C. Cir. 2000) (noting that FERC had denied a pipeline company's application for a certificate of public convenience and necessity because the company had not conducted an open season or otherwise demonstrated adequate market support for the proposed project); *Certification of New Interstate Nat. Gas Pipeline Facilities:  Statement of Policy*, 88 FERC ¶ 61,227, at 61,743 (Sept. 15, 1999) (declaring that FERC considers the "market support" for a proposed project, among other factors, in determining

75

whether to grant an application for a certificate of public convenience and necessity); *see also Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1325 (D.C. Cir. 2004) (noting that FERC had concluded that "there was ample market demand" for a proposed natural-gas pipeline project because several shippers had already contracted for 87% of the project's capacity); *cf.* 18 C.F.R. § 157.14(a)(12)(v) (requiring pipeline companies to attach to their application for a certificate of public convenience and necessity a "copy of each contract, letter of intent or other agreement for sale or transportation of natural gas proposed by the application," or, if no agreements have been made, to "indicate the basis for assuming that contracts will be consummated and that service will be rendered under the terms contemplated in the application").

Defendants argue that Transcontinental should have applied for a certificate of public convenience and necessity sooner than it did, so it would have had more time to complete the project before the in-service deadline. However, given the many years of preparations that went into Transcontinental's application, including almost a year of pre-filing review by FERC staff, Defendants' contention that an earlier application would have resulted in earlier receipt of a certificate is merely speculative. Defendants also contend that the in-service deadline is not as important—and not as fixed—as Transcontinental represents. To support that contention, Defendants point to an April 2013 letter from Transcontinental

indicating that, at that time, Transcontinental had a "targeted in-service date" of August 2016 for the Dalton Expansion Project.  That Transcontinental had hoped, almost two years before it filed its application, to have the pipeline installed and operational by August of 2016 does not warrant an inference that the in-service deadline eventually established was either unimportant or easy to change after Transcontinental filed its application, or after FERC granted a certificate.

In light of the multitude of factors that go into determining an in-service deadline for a natural-gas pipeline project, Transcontinental's participation in setting the deadline for completion of the Dalton Expansion Project does not constitute the kind of conduct that is typically deemed to represent unclean hands. *Cf. Int'l News Serv. v. Associated Press*, 248 U.S. 215, 245 (1918) (holding that a plaintiff was not barred from seeking injunctive relief due to unclean hands because the defendant had not shown that the plaintiff's behavior "constitute[d] an unconscientious or inequitable attitude towards its adversary"); *Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015) ("To assert an unclean hands defense, a defendant must show that (1) the plaintiff's wrongdoing is directly related to the claim, and (2) the defendant was personally injured by the wrongdoing.").

Certainly, equity would disfavor Transcontinental's argument that time was of the essence had Transcontinental created an artificially short deadline.  The

district court, however, did not err in concluding that Transcontinental had not unnecessarily crunched the time frame reasonably necessary to obtain approval from FERC and to negotiate agreements with the landowners.

### G.  Whether the District Court Abused Its Discretion by Issuing the Preliminary Injunction Without Holding an Evidentiary Hearing

Although the district court held a four-hour hearing on Transcontinental's motions for partial summary judgment and a preliminary injunction, it did not allow Defendants to present any testimony at the hearing.  Instead, the hearing was limited to argument on the issues raised in Transcontinental's motions.

Defendants argue that an evidentiary hearing was necessary to challenge the veracity of the declarations that Transcontinental produced in support of its motions.  They also contend that, under the circumstances, issuing a preliminary injunction granting Transcontinental access to their land without giving them the opportunity to testify was unfair.

A district court's decision to issue a preliminary injunction without holding an evidentiary hearing is reviewed for abuse of discretion.  *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210, 1212 (11th Cir. 2003); *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1538 (11th Cir. 1989).  "An evidentiary hearing is required for entry of a preliminary injunction only 'where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue.'"  *Cumulus Media,*

*Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002)

(quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998)).

"[W]here material facts are not in dispute, or where facts in dispute are not

material to the preliminary injunction sought, district courts generally need not

hold an evidentiary hearing." *Robertson*, 147 F.3d at 1313.  When there is little

dispute as to raw facts, but much dispute as to the inferences to be drawn from

those facts, "the balancing between speed and practicality versus accuracy and

fairness [is a matter committed] to the sound discretion of the district court."

*Cumulus Media*, 304 F.3d at 1178 (quoting *Robertson*, 147 F.3d at 1313).

Under the circumstances here, we conclude that the district court's decision

to issue a preliminary injunction without holding an evidentiary hearing was not an

abuse of the district court's discretion.[22]  Defendants were provided with adequate

notice of, and an opportunity to produce documentary evidence in opposition to,

Transcontinental's motions.[23]  Defendants proffered no evidence in opposition to

Transcontinental's motions, or in support of their request to present witness

---

[22]  We have pendent appellate jurisdiction to review the district court's pre-injunction order denying Defendants' request for an evidentiary hearing.  *See Robertson*, 147 F.3d at 1310 n.7.

[23]  The record reveals that Defendants were served with Transcontinental's motions, or executed waivers of service, between September 6, 2016, and September 23, 2016.  The hearing on Transcontinental's motions, although originally scheduled for October 17, 2016, was not held until October 26, 2016, after having been continued at Defendants' request.  Defendants therefore had adequate notice of, and opportunity to prepare an opposition to, Transcontinental's motions.  *Cf. Four Seasons*, 320 F.3d at 1211–12 (concluding that two days' notice was insufficient).

79

testimony at the hearing, to indicate that there were any genuine issues of material fact with respect to any prong of the preliminary-injunction analysis. *Cf. Robertson*, 147 F.3d at 1313 (concluding that an evidentiary hearing was not required where the nonmoving party did not produce any affidavits or other evidence showing a material issue of fact regarding the movant's claims); *All Care Nursing*, 887 F.2d at 1538–39 (concluding that an evidentiary hearing was required where the parties submitted conflicting affidavits that "placed in serious dispute issues central to [the moving party's] claims"). In other words, Defendants gave the district court no reason to conclude that credibility determinations would be necessary to decide either between competing evidence or between two or more plausible interpretations of the evidence submitted.

Accordingly, the district court did not abuse its discretion by issuing the preliminary injunction without holding an evidentiary hearing. *See Cumulus Media*, 304 F.3d at 1178; *Robertson*, 147 F.3d at 1312–13; *see also Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) ("[I]f there are genuine issues of material fact raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required." (citation omitted)); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) (holding that, when a party opposing a preliminary injunction seeks an evidentiary hearing, that party "must be able to persuade the court that the issue is indeed genuine and material and so a hearing

would be productive"); *cf. CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 265 F.3d 1193, 1207–08, 1027 nn.18–19 (11th Cir. 2001) (holding that an evidentiary hearing was required before a district court could reject evidence as not credible or choose between two plausible interpretations of the evidence submitted).

That said, we are mindful that a district court's decision not to allow any testimony at such a hearing could conceivably undermine the notion that pre-deprivation procedural due process "serve[s] the purpose of making an individual feel that the government has dealt with him fairly." *See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 196 n.14 (1985). Defendants here were afforded no opportunity to orally express their opposition before the district court permitted Transcontinental, as a matter of equity, to intrude upon their land, disturb their control over their property, and disrupt important aspects of their daily lives. As a matter of equity, a landowner's request to speak at a preliminary-injunction hearing should not be lightly rejected. That concern notwithstanding, Defendants in this case gave no indication that their testimony would illuminate any of the legal or factual issues faced by the court. Thus, we find no reversible error in the district court's failure to allow such testimony.

Having carefully reviewed the record, we conclude that Transcontinental satisfied its burden to establish each prong of the preliminary-injunction analysis,

and the district court did not abuse its discretion either in refusing to apply the doctrine of unclean hands or in refusing to hear witness testimony at the hearing. We therefore conclude that the district court did not abuse its discretion in issuing the injunction.

## IV.    The District Court's Decision to Require a Surety Bond Rather than a Cash Deposit as a Condition for Issuance of the Preliminary Injunction

### A.    Standard of Review

Decisions regarding the security required to be posted in connection with the issuance of a preliminary injunction are entrusted to the discretion of the district court. *See Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1127 (11th Cir. 1997) ("The amount of an injunction bond is within the sound discretion of the district court."); *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978) (noting that, when an injunction is issued under Rule 65 of the Federal Rules of Civil Procedure, the district court could "elect to require no security at all"). We therefore review the district court's decision to require a surety bond rather than a cash deposit for abuse of discretion. Questions of law are reviewed *de novo*. *See Hudgens*, 742 F.3d at 1329; *S. Nat. Gas*, 197 F.3d at 1372.

### B.    Whether the District Court Abused its Discretion in Requiring a Surety Bond Rather than a Cash Deposit

Defendants argue that the Fifth Amendment and the Georgia Constitution require payment of a cash deposit, rather than the posting of a surety bond, before

82

Transcontinental can lawfully enter their properties.  We address each argument in turn.[24]

>    1.    Whether the Fifth Amendment compels a district court to require a cash deposit as security for a preliminary injunction granting a plaintiff immediate access to an owner's real property in condemnation proceedings under the Natural Gas Act

The Fifth Amendment does not require that compensation be paid before a taking occurs.  *See Williamson Cty.*, 473 U.S. at 194–95, 195 n.14; *see also Bragg v. Weaver*, 251 U.S. 57, 62 (1919).  Instead, "all that is required is that a 'reasonable, certain and adequate provision for obtaining compensation' exist at the time of the taking."  *Williamson Cty.*, 473 U.S. at 194 (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 124–25 (1974)).

Defendants argue that a reasonable, certain, and adequate process for obtaining compensation does not exist "in the federal system" because federal courts have disagreed as to the measure of compensation to be awarded for a

---

[24]  We have jurisdiction in an appeal from the grant or denial of a preliminary injunction to reach matters that are "closely related" to the interlocutory order being appealed, so long as no relevant facts are at issue.  *Callaway v. Block*, 763 F.2d 1283, 1287 n.6 (11th Cir. 1985).  Here, the district court's December 2, 2016, bond order is closely related to its grant of a preliminary injunction because issuance of the injunction was conditioned on Transcontinental posting a bond in compliance with that order.  Accordingly, we may review Defendants' legal challenges to the district court's December 2, 2016, bond order.  However, we will not review the district court's decision as to the bond amounts, as Defendants' passing reference to that issue in their brief, without any discussion or citation of authority, is insufficient to raise the issue on appeal.  *See, e.g.*, *Hamilton*, 680 F.3d at 1318–19; *Singh*, 561 F.3d at 1278–79; *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

pipeline company's use of a landowner's property before the underlying

condemnation proceedings have concluded.  Defendants' conclusion does not

follow from their premise.  That courts disagree as to the method for measuring

compensation does not indicate the lack of an adequate process for determining

compensation.  A reasonable, certain, and adequate process exists so long as the

landowner is afforded an "opportunity to be heard" on the issue of compensation.

*Bragg*, 251 U.S. at 59; *see also Bailey v. Anderson*, 326 U.S. 203, 205 (1945);

*Georgia v. City of Chattanooga*, 264 U.S. 472, 483 (1924); *Presley v. City of*

*Charlottesville*, 464 F.3d 480, 490 (4th Cir. 2006).  In federal condemnation

proceedings, that process is governed by Rule 71.1(h) of the Federal Rules of Civil

Procedure, and Defendants have pointed to nothing indicating that the procedures

for determining compensation under Rule 71.1(h) are unconstitutional on their

face.  Accordingly, we reject Defendants' argument that no adequate procedure

exists for the ascertainment of the just compensation due a landowner for a

pipeline company's use of his property before the underlying condemnation

proceedings have concluded.

Defendants were afforded pre-deprivation process before the district court,

in addition to the opportunity for pre-deprivation process before FERC, and a

reasonable, certain, and adequate process exists for Defendants to obtain

compensation once their property is formally condemned.  Accordingly, the district

84

court's decision to require Transcontinental to post a surety bond rather than a cash deposit does not violate the Fifth Amendment.

> 2.    Whether the Georgia Constitution compels a district court to require a cash deposit as security for a preliminary injunction granting a plaintiff immediate access to a defendant's real property in condemnation proceedings under the Natural Gas Act

Defendants' argument that they are entitled to pre-taking compensation under the Georgia Constitution is also unavailing. Condemnation proceedings in federal court are governed by Rule 71.1 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 71.1(a); *S. Nat. Gas*, 197 F.3d at 1375. Rule 71.1 provides that the plaintiff in a condemnation proceeding "must deposit with the court any money required by law as a condition to the exercise of eminent domain and may make a deposit when allowed by statute." Fed. R. Civ. P. 71.1(j)(1).

Because Transcontinental sought to condemn Defendants' properties under a federal statute, federal substantive law controls on the issue of whether a deposit is required. *See* Fed. R. Civ. P. 71.1 advisory committee's note to 1951 amendment (original report) (note to subdivision (j)) (indicating that the necessity of a deposit is governed by the substantive law under which the plaintiff seeks to condemn the relevant property); *see also* 12 Charles Alan Wright et al., Federal Practice and Procedure § 3054, at 289 (3d ed. 2004) (noting that Rule 71.1 "makes no change in the substantive law on when a deposit is required or permitted," and, therefore,

"[i]f the state's power of eminent domain is invoked, the necessity for a deposit will be determined by state law, while federal statutes control in federal condemnations").

Section 7 of the Natural Gas Act does not require a cash deposit or any other type of security before a district court may exercise its equitable authority to issue a preliminary injunction granting a pipeline company immediate access to a particular piece of property. *See* 15 U.S.C. § 717f(h). Moreover, Rule 65(c) vests a district court with discretion in determining the amount and type of any security required. *See* Fed. R. Civ. P. 65(c) (providing that a court may issue a preliminary injunction only if the movant gives security "in an amount that the court considers proper"); *BellSouth Telecomms.*, 425 F.3d at 970–71; *Carillon Imps.*, 112 F.3d at 1127; *Corrigan Dispatch Co.*, 569 F.2d at 302–03. Because neither the Natural Gas Act nor Rule 65 require any particular type of security before a district court may issue a preliminary injunction, the district court had discretion to require Transcontinental to post a surety bond rather than a cash deposit as a condition to its issuance of the injunction.

Defendants' reliance on *Georgia Power Company v. Sanders*, 617 F.2d 1112 (5th Cir. 1980) (en banc), and *Sabal Trail Transmission, LLC v. Real Estate*, No. 1:16-CV-063-MW-GRJ, 2017 WL 2783995 (N.D. Fla. June 27, 2017), for a contrary conclusion is unpersuasive. In *Georgia Power*, the former Fifth Circuit

held that state law should be applied as the applicable federal rule for determining the amount of compensation due to a landowner in condemnation proceedings under the Federal Power Act. *Ga. Power*, 617 F.2d at 1124. Because the Federal Power Act did not itself provide a rule for determining just compensation, the former Fifth Circuit was faced with the question of whether federal common law or state law should provide the substantive rule of decision. *See id.* at 1115. Analyzing several factors rooted in concerns of federalism, the former Fifth Circuit ultimately concluded that state law should be adopted as the federal rule. *See id.* at 1115–24. In *Sabal Trail*, the Northern District of Florida concluded that the holding in *Georgia Power* applies in condemnation proceedings under the Natural Gas Act, so that "state substantive law governs the compensation measure" in such proceedings. *Sabal Trail*, 2017 WL 2783995, at *6.

Here, the district did not finally determine the matter of just compensation. Instead, the district court exercised its inherent equitable authority to issue a preliminary injunction in accordance with the requirements of Rule 65. Rule 65 provides a governing rule for determining the amount and type of security required, and that rule is court discretion. *See* Fed. R. Civ. P. 65(c); *BellSouth Telecomms.*, 425 F.3d at 970–71; *Carillon Importers*, 112 F.3d at 1127; *Corrigan Dispatch Co.*, 569 F.2d at 302–03. Because Rule 65(c) provides a clear rule of decision, we need not decide whether federal common law or state law would

87

provide a contrary rule.  *Cf. Ga. Power*, 617 F.2d at 1115 (concluding that, because the relevant statute did not "specify the appropriate rule of decision," this Court was required to decide whether federal common law or state law should provide the applicable rule for determining just compensation in condemnation proceedings under the Federal Power Act).  Stated plainly:  Rule 65(c)—not the Georgia Constitution—is the rule that governs the type of security required when a district court issues a preliminary injunction in federal condemnation proceedings.

3.    Whether the deposit requirement found in 40 U.S.C. § 3114 controls

Defendants' argument that we should infer that either the Natural Gas Act or the Federal Rules of Civil Procedure contains a deposit requirement because 40 U.S.C. § 3114 contains such a requirement is unpersuasive.  First, the instant condemnation proceedings were brought pursuant to 15 U.S.C. § 717f(h), not 40 U.S.C. § 3114, which applies to condemnation proceedings brought in the name of the United States.  Second, § 3114 provides that, upon filing a declaration of taking and depositing an estimated amount of compensation, title to the condemned land immediately vests in the government.  40 U.S.C. § 3114(b)(1).  In the context of a preliminary injunction, however, title does not immediately transfer from the landowner to the movant.  *See Sage*, 361 F.3d at 825 (citing *Danforth v. United States*, 308 U.S. 271, 284–85 (1939)).  Accordingly, if it is later determined that the preliminary injunction should not have been issued—and thus

88

that the movant is ultimately not entitled to possession—then the landowner will retain title to his land and may recover damages from the movant. *See id.* at 825–26 (indicating that, if a natural gas company's "deposit (or bond) is less than the final compensation awarded, and the company fails to pay the difference within a reasonable time, 'it will become a trespasser, and liable to be proceeded against as such'" (quoting *Cherokee Nation v. S. Kan. Ry. Co.*, 135 U.S. 641, 660 (1890))); *cf.* Fed. R. Civ. P. 65(c) (stating that the security required for a preliminary injunction is "an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained").

In short, careful review of the record and the cited statutory authority provides no basis for concluding that the district court abused its discretion in requiring Transcontinental to post a surety bond in an amount equal to twice the appraised values of the easements before allowing Transcontinental to access Defendants' properties. In other words, the district court did not abuse its discretion in ordering Transcontinental to post a surety bond rather than a cash deposit.

## CONCLUSION

We conclude that the district court properly granted summary judgment in favor of Transcontinental on its claim for condemnation under the Natural Gas Act.

We further conclude that the district court did not abuse its discretion in issuing a preliminary injunction granting Transcontinental immediate access to Defendants' properties conditioned on Transcontinental posting a surety bond in an amount equal to twice the appraised values of the interests condemned.  We therefore **AFFIRM** the decisions of the district court.