**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10935
_____

WHITESELL CORPORATION,

                                                    *Plaintiff-Appellant,*

*versus*

ELECTROLUX HOME PRODUCTS, INC.,

                                                    *Defendant-Appellee,*

HUSQVARNA, A.B.,

                                        *Defendant-Counter Claimant-*
                                        *Counter Defendant,*

HUSQVARNA OUTDOOR PRODUCTS, INC.,

                                                    *Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 1:03-cv-00050-JRH
_____

Before WILLIAM PRYOR, Chief Judge, and GRANT and KIDD, Circuit Judges.

KIDD, Circuit Judge:

The district court described this case as dealing with a "bad marriage" between two companies, Whitesell Corporation and Electrolux Home Products (and, later, its spinoff, Husqvarna Outdoor Products). Unfortunately, most of this marriage has played out in twenty-plus years of federal litigation, which has now reached us. As one might expect, several rulings occurred over those twenty years, most of them against Whitesell. Whitesell ultimately lost at trial and now appeals those rulings.

First, Whitesell urges us to find that the district court erred when it entered summary judgment to determine the scope of the parties' agreement and related issues. Second, Whitesell believes that the district court erroneously sanctioned it for discovery violations. Third, Whitesell contends that the district court should not have entered summary judgment on Whitesell's price increase claim. Fourth, Whitesell believes that the district court should have allowed it to amend its complaint. Finally, Whitesell argues that the district court should not have excluded certain categories of evidence from trial.

We deny each of Whitesell's challenges and close this chapter of the bad marriage.

## I.    STANDARD OF REVIEW

This opinion will address each of Whitesell's arguments, and we must bear in mind the standard of review for each.

First, the summary judgment arguments. A district court may grant summary judgment "when the record evidence, including depositions, sworn declarations, and other materials, shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Feliciano v. City of Mia. Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56(a), (c)). "We review the district court's summary judgment de novo, viewing the facts and drawing all reasonable inferences in the light most favorable to the non-moving party." *Ginsburg v. United States*, 17 F.4th 78, 83 (11th Cir. 2021). "We may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below." *Powers v. United States*, 996 F.2d 1121, 1123–24 (11th Cir. 1993). Further, we review a district court's interpretation of a contract de novo. *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1256 (11th Cir. 2006).

Second, the discovery sanctions and trial evidence. A district court's decisions to impose discovery sanctions and to exclude evidence at trial are both reviewed for an abuse of discretion. *See, e.g., Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510, 1519 (11th Cir. 1986) (per curiam) ("It is well settled that the standard of review for an appellate court in considering an appeal of sanctions under [Federal Rule of Civil Procedure] 37 is sharply limited to a

search for abuse of discretion and a determination that the findings of the trial court are fully supported by the record." (citation modified)); *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997) (stating that we review discovery sanctions for abuse of discretion); *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004) ("We review the admission of the exhibit for abuse of discretion, which means that we look to see if the district court made a clear error of judgment or applied an incorrect legal standard." (citation modified)).

Finally, the motion to amend the complaint. A district court's denial of a motion to amend a complaint is reviewed for abuse of discretion, but any determination that a particular amendment to the complaint would be futile is reviewed de novo. *Harris v. Ivax Corp.*, 182 F.3d 799, 802 (11th Cir. 1999). Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant. *See Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004).

## II.    INTRODUCTION

As previewed, this litigation has been winding its way through federal court for more than twenty years, so there are a lot of facts. We will do our best to distill them to the ones that are salient to this appeal, and we introduce them in several different sections that correspond to Whitesell's arguments on appeal.

We begin with the parties. Whitesell manufactures and distributes things like bolts and screws to consumer-product

manufacturers like Electrolux. Electrolux manufactures household appliances, such as dishwashers, refrigerators, freezers, ranges, washers, and dryers. Husqvarna manufactures outdoor lawn and garden products, such as chainsaws, mowers, and lawn tractors. Husqvarna used to be a part of Electrolux. In 2006, however, Husqvarna was spun off from Electrolux as part of a corporate restructuring to separate its indoor and outdoor divisions.

Now we will discuss the "bad marriage."

### III.    THE BAD MARRIAGE

A.    *The Parties' Agreements*

1.    The Strategic Partnership Agreement

Whitesell and Electrolux entered into the Strategic Partnership Agreement ("SPA") on December 14, 2000. The SPA stated that the parties "desire[d] to enter into a strategic business relationship in which Electrolux is willing to make a long-term commitment to purchase all of its current and future needs of cold headed/threaded fasteners and various related Class C items hereafter referenced as Good(s) . . . from Whitesell."

The SPA defined "Good(s)" as "all cold headed/threaded fasteners, clips, wire ties, nuts, pins, special cold formed parts, screw machined parts, clamps, spacers, plastic fasteners, components, sub-components, or any type of material, whether identified by an Electrolux part number or not assigned to such part, and other Class C items . . . ." The SPA instructed the parties to create "Exhibit B," which would list the Goods to be purchased by Electrolux

from Whitesell. Exhibit B is important, and we will come back to it shortly.

As for pricing, the SPA provided that Whitesell would maintain its pricing of the Goods for the duration of the agreement but created a process for Whitesell to request a price increase if an adverse market condition "drastically" affected its costs. If Whitesell requested a price increase, Electrolux could ask Whitesell to provide specific evidence to support the price change. Electrolux then could either accept the substantiated price change or seek quotes for the Goods from other suppliers. Once Electrolux received quotes from other suppliers, Whitesell would have the option to match the bona fide best offer before Electrolux proceeded with the other supplier.

Back to Exhibit B. The parties never agreed on an Exhibit B, which was supposed to list the Goods Electrolux was obligated to purchase from Whitesell. Naturally, within months of the SPA's execution, Electrolux and Whitesell began arguing about its scope. Whitesell insisted that the SPA required Electrolux to use Whitesell as its supplier for increasingly more parts, including steering shafts and parts for tractors. The disagreement came to a head in February 2003, when Whitesell stated that Electrolux had materially breached the SPA, and it threatened to stop performing.

Concerned by Whitesell's threat to stop performing, Electrolux filed a declaratory judgment action in district court in March 2003. Electrolux requested that the court determine whether the

SPA required it to use Whitesell as its supplier for the "wireform" and "Brunner" parts used to manufacture lawn tractors.

### 2.    The Settlement Memorandum

The parties eventually entered into the Settlement Memorandum to resolve the disputes under the SPA. It required the parties to prepare and mutually agree upon a parts list for Exhibit B. Exhibit B would now include the "[p]arts numbers for all current parts Whitesell now supplies to [Electrolux]"; "[p]art numbers for parts in process of being transitioned"; and part numbers for those being supplied by Bamal, another supplier. The Settlement Memorandum also provided that, if Whitesell met certain conditions, Whitesell would supply Electrolux with the "Brunner and/or wireform parts" that would be described in an Exhibit B-1. The Settlement Memorandum required the parties to update both Exhibit B and Exhibit B-1 every six months. Spoiler: they did not.

The Settlement Memorandum acknowledged that the SPA was still in effect except as modified by the Settlement Memorandum. After the settlement, the district court administratively closed the case but retained jurisdiction to enforce the Settlement Memorandum.

On March 9, 2005, Whitesell moved to reopen the case to enforce the Settlement Memorandum. Whitesell alleged that Electrolux wrongfully rejected its request for a price increase in 2004 and 2005, and to avoid paying the increase, Electrolux submitted "inconsistent," "made-up," or "manufactured" quotes from named and unnamed competitors.

### 3.    The Consent Order

The parties reached another compromise. On May 17, 2005, the district court entered a consent order that required Electrolux to purchase from Whitesell its requirement for all of the Goods that Whitesell was then supplying to Electrolux. Electrolux had to pay Whitesell $3,382,216.07 and remain current on all future undisputed invoices. Notably, the consent order did not resolve the underlying price increase dispute but, instead, provided a process for how the payment would be made once it was resolved. Finally, the consent order concluded that any conflicts between the consent order and the SPA or the Settlement Memorandum would be resolved in favor of the consent order.

### B.    *First Summary Judgment Order*

At this point, there were three documents that governed the parties' relationship: the original SPA, the Settlement Memorandum, and the consent order. Naturally, one party would allege a violation of all three. Whitesell did just that in a new lawsuit filed in October 2005. Whitesell subsequently amended its complaint to add Husqvarna as a defendant once it was spun off from Electrolux and assumed Electrolux's obligations under the agreements. The defendants countersued, alleging, among other things, that Whitesell failed to provide specific cost increase evidence to justify the increases in the specific unit prices.

The defendants filed a motion for judgment on the pleadings or, in the alternative, motion for partial summary judgment. They requested that the district court interpret the scope of the SPA,

Settlement Memorandum, and consent order and reaffirm its previous holding that the SPA covered only the following five categories: (1) "[a]ll parts Whitesell currently supplied to [Electrolux]"; (2) "[p]arts in the process of being transitioned"; (3) part numbers for those being supplied by Bamal, another supplier; (4) "Brunner" parts; and (5) "wireform" parts.

The district court found that the SPA was too indefinite to enforce in its entirety. The SPA's definition of Goods, "at best, begins with a list of generic categories of parts with minimal objectively determinable features" and then "quickly balloons to include 'any type of material,' and 'Class C items.'" The potential scope included "tens of thousands" of different types of parts "totaling billions of individual pieces," and the purported definition "embrace[s] an indeterminate universe of physical items that cannot serve as a definite subject matter for a legally enforceable agreement." The district court then concluded that the definition—without an Exhibit B—did not set forth a "mechanical" or "reasonably objective" test for a court or a jury to use when trying to "classify innumerable pieces," and any remedy granted on the SPA would be "speculative and arbitrary."

Yet all was not lost. The district court determined that the Settlement Memorandum identified three categories of parts that were objectively determinable: "(1) all parts Whitesell was supplying to [Electrolux] as of the date of the Settlement Agreement; (2) all Springfield Division parts which were being supplied by Bamal as of January 1, 2003[;] and (3) the 'Brunner' parts." The parties'

course of performance led the district court to add a fourth category of parts: "as to the parts which have been supplied under the contracts, the parties have, in effect, agreed that these items fall within the scope of the Agreements." Thus, the district court concluded that Whitesell could maintain its breach of contract claims as to the four identified categories of parts.

Whitesell asked the district court to reconsider its ruling because it came before the parties could undertake additional discovery. The district court denied the motion and explained that no additional discovery was needed because the "Goods" in the SPA were undefined as a matter of law and the issue of enforceability did not turn on the parties' subjective intent.

We will pause here to discuss Whitesell's challenges to this determination.

### 1.    Appeal of First Summary Judgment Order

On appeal, Whitesell asserts many competing arguments about why the district court erred in determining that the SPA's definition of Goods was too vague as to be enforceable. But the SPA's definition—and the parties' disagreement over it—was rendered largely irrelevant by the Settlement Memorandum, which the parties intended to redefine the scope of the definition of Goods in the SPA.

Georgia law is clear that "[p]arties to a contract can, by subsequent mutual agreement, modify a written contract 'that did not express their actual agreement, just as completely and effectually as they might do with respect to one that did fully and correctly

express such intention.'" *Thomas v. Garrett*, 456 S.E.2d 573, 575 (Ga. 1995) (quoting *Albany Fed. Sav. & Loan Ass'n v. Henderson*, 36 S.E.2d 330, 345 (Ga. 1945)). The Settlement Memorandum modified the SPA's definition of Goods, and that is the agreement that the district court appropriately analyzed to determine the scope of the parties' ongoing relationship.

The district court also did not err when it determined that the Settlement Memorandum cured the SPA's vague definition of Goods to the extent of the parties' performance. Georgia law provides that a vague contract may become enforceable "by performance tendered by one side and accepted by the other . . . ." *Touche Ross & Co. v. DASD Corp.*, 292 S.E.2d 84, 86–87 (Ga. Ct. App. 1982); *see also Pine Valley Apartments Ltd. P'ship v. First State Bank*, 237 S.E.2d 716, 719 (Ga. Ct. App. 1977) ("Indefiniteness may be obviated by performance and acceptance of performance." (citation modified)); *Self v. Smith*, 107 S.E.2d 721, 726 (Ga. Ct. App. 1959) ("A deficiency in a contract caused by indefiniteness . . . is cured by performance.").

Finally, the district court did not abuse its discretion when it entered summary judgment on the scope of the parties' agreement before allowing any discovery on the issue. Whitesell is correct that the general rule is that a district court should allow discovery before ruling on a motion for summary judgment. *See Jones v. City of Columbus*, 120 F.3d 248, 253 (11th Cir. 1997) (per curiam). "Nevertheless, whether to allow discovery before ruling on a motion for summary judgment is ultimately a matter committed to the

discretion of the district court." *Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130, 1156 (11th Cir. 2018). And "[u]nder the abuse-of-discretion standard, this Court will leave undisturbed a district court's [discovery] ruling unless the district court has made a clear error of judgment or has applied the wrong legal standard." *Id.* (citing *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1307 (11th Cir. 2011)).

Here, the district court resolved a question of law—the interpretation of the parties' contract—that did not require additional discovery. *See Laws. Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995) ("Contract interpretation is generally a question of law."). Plus, Whitesell never identified any specific item of discovery that would help to explain the terms used in the SPA's definition of Goods. *See Wallace v. Brownell Pontiac-GMC Co.*, 703 F.2d 525, 527 (11th Cir. 1983) ("The nonmovant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts, but rather he must specifically demonstrate how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." (citation modified)).

In sum, we find that the district court did not err when it defined the scope of the parties' agreement based on the subsequent Settlement Memorandum, and it did not abuse its discretion in refusing to postpone its legal interpretation for irrelevant discovery.

C.    *Debacles in Discovery*

Back to the litigation. Discovery proceeded over the course of several years, and Whitesell challenges the district court's rulings on two discovery disputes: (1) Whitesell's failure to produce its itemized product costs and expenses; and (2) Electrolux's failure to produce one of its executive's emails from 2002 to 2004.

1.    Whitesell's Itemized Product Costs and Expenses

To prepare a defense against Whitesell's lost profits claim, the defendants sought information related to the costs that Whitesell incurred to manufacture or acquire each product it sold to the defendants. Whitesell refused to provide this information. So, the defendants moved to compel its production, and the district court ordered Whitesell to respond to the discovery request unless it had a well-founded objection.

Subsequently, the defendants claimed that Whitesell was not obeying the order. They argued that Whitesell had used a software system called the Industrial and Financial System ("IFS") to track part-by-part product cost since May 2003, and they cited the testimony of Whitesell's Chief Financial Officer from different litigation. Moreover, the defendants cited several of Whitesell's internal emails that referenced the cost-per-part data in a cost analysis. Notwithstanding the testimony and emails, Whitesell asserted that the IFS did not track cost-per-part data, and it did not produce the information.

The district court ordered Whitesell to provide an interrogatory response certifying that it did not have any other information related to the cost of the parts and that the cost of the parts was not tracked in the IFS. During subsequent discovery hearings, Whitesell continued to tell the district court that it did not possess any information related to product-level cost data. Whitesell repeatedly informed the court that the IFS "never was operational" for the defendants, that Mr. Whitesell—the President and CEO of Whitesell—had a general sense of the ad-hoc cost of the parts, and that costs of parts data simply "doesn't exist." Finally, Whitesell certified to the district court that it had "produced all responsive data and information, in its possession, custody and control concerning product costs and expenses . . . ."

That turned out to be false. Nearly four years after the initial request for cost information, the defendants deposed Whitesell employee Chris Jones. Jones stated that the IFS "has a cost number for the part typically" and confirmed that the IFS records a cost number for each individual part, but that it was not updated over time. Jones testified that he was unaware of any other system that tracked the cost like the IFS and that it provided a "snapshot in time" of the product cost. Finally, Jones confirmed that the IFS maintained historical information of purchase orders.

Then, in a separate deposition, Mr. Whitesell himself confirmed that the company filled out a "standard cost field" in the IFS.

Not surprisingly, the defendants ran back to court with this admission and filed another motion to compel Whitesell's cost

information. After the close of fact discovery, Whitesell revealed that, without informing the defendants, it had produced some of the information just before Mr. Whitesell's deposition and the close of discovery, but it had included only some (not all) of the information in the production.

The defendants moved for sanctions based on Whitesell's prior misrepresentations, and the district court held a hearing on the motion. Whitesell argued that the product-level cost data from the IFS was irrelevant because it was inaccurate. The district court explained that the bigger issue was that Whitesell had repeatedly said the data did not exist when it did.

The district court struck Whitesell's lost profits claim. The sanction was based on Federal Rule of Civil Procedure 37(b)(2)(A) and 37(c) and the court's inherent authority. The district court concluded that Whitesell had violated its discovery obligations and had misled the defendants and the court.

The district court also determined that Whitesell had acted in bad faith by representing that the IFS's product-level cost data did not exist, then once it was discovered through other means, arguing that it was irrelevant. The court explained that Whitesell could not unilaterally determine what evidence it would produce based upon its own evaluation of its usefulness or relevance.

Finally, the district court concluded that the only appropriate sanction was to strike Whitesell's lost profits claim because the defendants' inability to use the IFS cost data throughout discovery resulted in extraordinary prejudice.

### 2.    Electrolux's Emails

After the district court sanctioned Whitesell, Whitesell filed its own motion for sanctions. Whitesell argued that the defendants had failed to preserve emails from one of Electrolux's executives from 2002 to 2004. Based on this failure and an earlier finding of spoliation, Whitesell sought to reinstate its lost profits claim and requested a default judgment against the defendants as to liability on that claim.

The district court denied Whitesell's motion. The court found that Whitesell waited an unreasonable amount of time to file its motion. Additionally, the previous order resolved a discovery dispute and found only that Whitesell had made a preliminary showing of spoliation. Finally, Whitesell had not experienced any prejudice from the failure to preserve the emails because they did not relate to Whitesell's remaining claims.

### 3.    Issues on Appeal

We will now address Whitesell's challenges to these discovery orders. Whitesell argues that the district court abused its discretion by sanctioning Whitesell for its discovery violations while declining to sanction the defendants for their violation. We disagree.

### a.    Striking Whitesell's Lost Profits Claim

The district court sanctioned Whitesell by striking its lost profits claim pursuant to Federal Rules of Civil Procedure 37(b)(2)(A) and 37(c) and its inherent authority. Rule 37(b)(2)(A)

states that if a party "fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders," including striking pleadings in whole or in part. Fed. R. Civ. P. 37(b)(2)(A). And Rule 37(c) provides that the district court may prevent a party from using information or witnesses that the party failed to disclose under Rule 26. *Id.* 37(c). In addition to or instead of this sanction, the district court, "on motion and after giving an opportunity to be heard[,]" may impose the same sanctions listed under Rule 37(b)(2)(A), including striking a party's claim. *Id.* Moreover, the district court has "the inherent authority to issue sanctions as a punishment for bad-faith behavior in the proceedings before them." *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1304 (11th Cir. 2020).

The district court previously ordered Whitesell to produce all of its product-level cost data. Over the course of four hearings, Electrolux and Husqvarna asked the district court to order Whitesell to produce all contemporaneous cost data in "whatever form it may be in," including product-level cost data from the IFS. Whitesell repeatedly told the district court that it did not have any information on a "part-by-part basis" from the IFS, "the IFS system never was operational with respect to the relationship with the defendants," and if the court ordered it to produce additional information, "I don't know what I would be able to give you."

Here, the district court permitted extensive briefing on whether Whitesell failed to update its disclosures, and it held a hearing on the matter. After providing Whitesell with ample

18                    Opinion of the Court                    23-10935

opportunities to be heard, the district court found that Whitesell had failed to update its disclosures as required. *See* Fed. R. Civ. P. 37(c). We find that the district court was well within its discretion to make this finding and that striking Whitesell's lost profits claim was an appropriate sanction given the nature of the violation— withholding the cost information.

b.        Declining To Sanction Electrolux

We likewise find that the district court did not abuse its discretion by denying Whitesell's reciprocal motion for sanctions as untimely. District courts have wide leeway in this regard. *See Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993) (explaining that district courts have broad authority to determine if discovery sanctions are warranted). Whitesell waited several years—until after it was sanctioned—before filing its motion for sanctions. There is no reason to disturb the district court's order denying the motion as untimely. *See Harris v. Chapman*, 97 F.3d 499, 506 (11th Cir. 1996) (explaining "wide discretion" is given to "[a] judge's decision as to whether a party or lawyer's actions merit imposition of sanctions[, which] is heavily dependent on the court's firsthand knowledge, experience, and observation").

D.    *Pretrial Issues*

At this point in the litigation, discovery has closed, and the case is slowly making its way to trial. Whitesell challenges two pretrial orders: (1) the district court entered partial summary judgment in favor of Electrolux and Husqvarna on Whitesell's price increase claim; and (2) the district court denied Whitesell's motion

for leave to amend its Second Amended Complaint to seek prejudgment interest.

### 1.    Summary Judgment on Price Increase Claim

Whitesell alleged that Electrolux wrongfully rejected its request for a price increase for certain parts in 2004 and 2005 (the "Price Increase Claim"). According to Whitesell, Electrolux submitted "inconsistent," "made-up," or "manufactured" quotes from named and unnamed competitors to avoid the valid price increase. Electrolux (and later Husqvarna), ultimately refused to pay the increased prices.

In early 2010, the parties filed cross-motions for partial summary judgment on Whitesell's Price Increase Claim. Whitesell argued that the defendants did not request any cost increase evidence for the 2005 increase, so it was not obligated to provide any evidence under the terms of the SPA. The defendants countered that they did request cost increase evidence, and Whitesell failed to provide sufficient evidence to justify the price increase because it provided information only in 2004, and that evidence consisted only of newspaper articles describing the rise of steel prices, a chart titled "Taiwan Wire Analysis," and six invoices written in Mandarin.

The district court granted the defendants' motion for summary judgment and denied Whitesell's motion. The district court found that the undisputed evidence showed that Electrolux had requested evidence to justify the 2005 price increases. The district court then concluded that no reasonable jury could find that Whitesell provided reasonable documentation to justify the price

increases. Whitesell had provided evidence of a general increase in the price of steel, but that could not justify the increase in prices on parts that did not contain steel. In addition, Whitesell's price increases for specific parts ranged from 3.01% to 95.64% without any evidence justifying the differences.

Whitesell argues that the district court impermissibly relied on inferences to support granting summary judgment. But to the contrary, Whitesell simply failed to identify sufficient competing evidence.

As to the request for cost increase evidence, the defendants testified that they had phone calls in which they requested additional information for the 2005 price increase. Indeed, Mr. Whitesell stated that Whitesell had already provided proof for the price increase in 2004 when Electrolux's Vice President for Procurement responded that the 2005 price increases were unacceptable and against the plain language of the SPA. Whitesell did not point to any conflicting testimony. Instead, it cited the emails where the defendants were seeking competing quotes. But this supports the defendants' contention that they requested evidentiary support for the price increases.

We conclude that Whitesell failed to set forth more than a "scintilla" of evidence to support its argument that the defendants did not request supporting documents for the price increase. *See Calderon v. Sixt Rent a Car, LLC*, 114 F.4th 1190, 1199 (11th Cir. 2024) (explaining that "the nonmoving party must offer more than a mere scintilla of evidence for its position" (citation modified)).

The district court also correctly determined that Whitesell failed to comply with the terms of the SPA. The SPA required Whitesell to "provide such cost increase evidence to Electrolux for any requested changes in any specific unit prices." Whitesell provided only "newspaper articles that generally discuss[ed] the rise in steel prices," "a one-page chart entitled 'Taiwan Wire Analysis' which show[ed] that Whitesell's costs [for] obtaining two types of material from Taiwan had increased over 60% in an eighteen-month period," and six untranslated invoices in Mandarin that "presumably" supported the chart. The evidence was not tied to any specific price increase, which was contrary to the SPA's plain language (the evidence must support the "requested changes in any specific unit price[]").

Because Whitesell failed to tie its evidence to any specific unit price change, we find that, under the plain language of the SPA, the evidence was insufficient as a matter of law to support Whitesell's requested price increase. *See Primary Invs. LLC v. Wee Tender Care III, Inc.*, 746 S.E.2d 823, 826 (Ga. Ct. App. 2013) ("The favored construction will be that which gives meaning and effect to all the terms of the contract . . . ." (citation modified)).

### 2.    Motion for Leave To Amend the Complaint

On April 21, 2016, Whitesell sought leave to amend its Second Amended Complaint to assert that it was seeking prejudgment interest on its claims for unliquidated damages. Whitesell explained that while an award of prejudgment interest for liquidated damages was mandatory, the district court had discretion in

awarding prejudgment interest for unliquidated damages under Georgia law. Electrolux and Husqvarna opposed Whitesell's motion to amend the complaint, claiming that Whitesell sought to add an entirely new claim that should not be allowed at that late stage of the litigation.

The district court denied Whitesell's motion based on undue delay and futility. The court explained that the First Amended Complaint, filed on October 20, 2006, had governed the case for almost a decade, and Whitesell had never included a claim for interest. Further, the addition of the interest claim contravened the district court's earlier order requiring Whitesell to "delete the interest claim." Finally, the court held that the claim for prejudgment interest was futile because it is available only when the amount of damages is ascertainable at the time of the breach.

We find that the district court did not abuse its discretion in denying the motion for leave to amend based on undue delay. We have made clear that a district court may deny a motion for leave to amend based *solely* on undue delay. *See Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1287 (11th Cir. 2003) (holding that the district court did not abuse its discretion "by enforcing its timetable for disposition of the case"). Because we find that the district court did not abuse its discretion in this regard, we need not address Whitesell's challenge to the district court's futility finding.

E.    *Trial*

It is now January 2023 on our timeline, and after twenty years of litigation, the case is finally ready to proceed to a ten-day jury trial. Whitesell had only one remaining claim: Husqvarna breached its contractual obligation by failing to pay for Whitesell's inventory of certain parts supplied by Brunner and Matrix during the failed transition effort. Husqvarna asserted an affirmative defense and counterclaim against Whitesell, alleging that Whitesell breached its obligations under the SPA because it could not or would not supply the Brunner and Matrix parts at contract prices. Finally, Electrolux and Husqvarna asserted counterclaims for damages resulting from Whitesell's failure to provide a timely and accurate inventory list during the phase-out period of the SPA.

1.    Pretrial Evidentiary Rulings

Before trial, the district court explained that the scope of the case had been significantly narrowed since the complaint was originally filed, and the evidence presented at trial would have to be relevant to the remaining claims, not just the parties' wide-ranging relationship and initial claims. Whitesell now challenges the district court's exclusion of: (1) internal emails from Electrolux from 2004 and 2005 that Whitesell has named the "Bad-Faith Emails"; (2) testimony relating to Electrolux and Husqvarna's unpaid invoices; and (3) communications leading up to the consent order that allegedly shows Electrolux's misconduct.

### a.    Bad-Faith Emails

Whitesell sought to introduce a series of "Bad-Faith Emails" from Electrolux's executives that dated from December 2004 to October 2005. In the emails, Electrolux executives stated that they wanted to get out of the agreements with Whitesell. Whitesell argued that the Bad-Faith Emails showed that Electrolux and Husqvarna had materially breached the contract first and that they were not operating in good faith. Whitesell argued it was entitled to tell the "full story" to the jury.

The district court excluded the Bad-Faith Emails because Whitesell had failed to put forth any reason why they were related to the remaining claims. The district court was concerned "that because of the lack of relevance to the claims," the jury would think that "the Court [was] blessing their use to create a cloud of bad faith over these breach of contract claims" when "motive seems to be irrelevant." Finally, the district court concluded that "[t]he risk of prejudice and confusion to the jury is extremely high" and that "the introduction of these documents, particularly with their lack of relevance, would certainly trigger [a] journey[] down multiple rabbit paths that would severely extend the time set aside for this trial."

### b.    Unpaid Invoices

Whitesell also sought to introduce testimony relating to Electrolux and Husqvarna's failure to pay more than $6.5 million in "undisputed invoices." Electrolux and Husqvarna, however, stipulated to liability and paid the outstanding sums during the pending litigation. But Whitesell believed that Electrolux and

Husqvarna's "persistent and unjustified non-payment" was evidence of their "global[]" bad faith and supported Whitesell's first-breach defense.

The district court excluded any testimony relating to Electrolux and Husqvarna's failure to pay invoices. It concluded that the testimony was not relevant to the remaining claims regarding the Brunner and Matrix parts.

### c.    Misconduct Leading to Consent Order

Finally, Whitesell sought to introduce Electrolux communications leading up to the consent order entered in 2005. Whitesell argued that the communications were relevant to show that Electrolux breached the SPA first, and they provided context by showing that Electrolux's failure to honor the Settlement Memorandum necessitated the consent order. The district court excluded this evidence because the communications reflected that there was dissatisfaction with the contract in 2004 but were not relevant to the remaining claims in the case.

### d.    Issues on Appeal

Whitesell challenges the exclusion of the three categories of evidence, but we find that the district court properly excluded them as irrelevant. Federal Rule of Evidence 401 provides that "[e]vidence is relevant[] if it has any tendency to make a fact more or less probable than it would be without the evidence[] and the fact is of consequence in determining the action." Here, the district court properly evaluated whether each category of evidence was relevant to the issues remaining for trial and determined that they were not.

*See Cabello v. Fernández-Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005) (per curiam) ("The district court has wide discretion in determining the relevance of evidence produced at trial."). We will not disturb that decision.

But even if the three categories had been relevant, the Federal Rules of Evidence still would require the district court to evaluate whether the "probative value [of the evidence] is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. For each of the three categories of evidence, the district court found an "extremely high" "risk of prejudice and confusion to the jury" and that "the introduction of these documents, particularly with their lack of relevance, would certainly trigger [a] journey[] down multiple rabbit paths that would severely extend the time set aside for this trial." We find that the district court did not abuse its discretion in excluding any of the three categories of evidence. *See United States v. Frazier*, 387 F.3d 1244, 1258–59 (11th Cir. 2004).

F.    *Verdict*

The jury returned a verdict for Electrolux and Husqvarna on February 3, 2023. The jury found that while Husqvarna had breached its contractual obligations to Whitesell by failing to pay for Whitesell's inventory, Husqvarna had proven that Whitesell had failed to perform a concurrent condition—transitioning the supply of Brunner and Matrix parts to Husqvarna—and awarded

Husqvarna $5,880,262. The jury next determined that Whitesell breached its contractual obligations by failing to provide an accurate inventory list during the phase-out period to Husqvarna and awarded Husqvarna $1,853,285. Finally, the jury found that Whitesell breached its contractual obligations by failing to provide an accurate inventory list during the phase-out period to Electrolux and awarded Electrolux $1,192,527.

On February 28, 2023, the district court entered judgment in favor of Electrolux and Husqvarna and against Whitesell in accordance with the jury's verdict.

## IV. CONCLUSION

The bad marriage is over. The district court's orders and judgment are **AFFIRMED**.